1841.

Stewart's Executor, *appellant*, and Lispenard and others, *respondents*.

*Imbecility of mind* in a testator will not avoid his last will and testament. *Idiots, lunatics,* and persons *non compos mentis,* are disabled from disposing of their property by will, but every person not embraced within either of the above classes, of lawful age and not under coverture, is competent to make a will, *be his understanding ever so weak.* Courts, in passing upon the validity of a will, do not measure the extent of the understanding of the testator; *if he be not totally deprived of reason,* whether he be wise or unwise, he is the lawful disposer of his property, and his will stands as a reason for his actions.

The cases in the books avoiding devises, conveyances and contracts of the *imbecile* do not conflict with the above rule. In those cases the acts were held void, not on account of the general and positive disability of the party to perform *all* similar acts, but because the whole transaction, with its accompanying circumstances, including of course the fact of mental imbecility, evinced that his *consent* was wanting to the *particular act,* the subject of adjudication.

In the case of the will of a person of imbecile mind, a *want of consent* by the testator to a *particular will* may be urged: from his inability to comprehend its effect and nature, from the dispositions of the property being contrary to what naturally might have been expected from the relative situation of the parties, the preferences, partialities and former testamentary declarations of the testator, the absence, at the making of the will, of those to whom he commonly looked for advice, and generally from the surrounding circumstances, into which the court called to pass upon the validity of the will will look with vigilance. So, on the contrary, evidence of the general knowledge and understanding of the testator that he is the owner of property, and has the power of disposing of it by will, of his previous declarations and intent as to its disposition, of his gratitude and attachment to the donee for long and persevering care and kindness, and the will itself being in a simple form, intelligible to the plainest mind, will be sufficient to justify the court to pronounce it a genuine and valid instrument.

A man's capacity may be perfect to dispose of property *by will,* yet inadequate for the management of other business, as for instance, to make contracts for the purchase and sale of property; and therefore a court of chancery may commit the property of a person *incapable of managing his estate* to the charge of a committee, and yet, after his death, give effect to a will made by him whilst laboring under such incapacity.

The right of testamentary disposition of property is a natural right, and not a mere institution of positive law; it is subject to the restrictions and regulations of civil legislation, but is not its mere creature. Per *Senator* Verplanck.

Where a circuit judge, and the Chancellor, upon consecutive appeals, *affirmed* the decision of the surrogate refusing to admit a will to probate,

and the court for the correction of errors *reversed* the decisions below, the latter court, under the circumstances, refused to direct the making up of a feigned issue *for trial by jury* of the questions arising upon the application, and made a peremptory order that the proceedings be remitted and that the will be admitted to probate.

APPEAL from Chancery. In August, 1834, Alice Lispenard, of the city of New-York, made her last will and testament, whereby she gave and devised all her estate real and personal, to Alexander L. Stewart, and appointed him sole executor. She died in 1836, and in March following, the executor applied to *James Campbell, Esq.*, then surrogate of the county of New-York, for probate of the will. The next of kin and the heirs at law of the testatrix, were duly cited; and proofs were taken in support of, and in opposition to the application.

Alice Lispenard was a daughter of Anthony Lispenard who died in 1806, having by his last will and testament, made in 1802, given all his estate, real and personal, to his three sons Leonard, Thomas and Anthony, his daughter Sarah, and his grand-daughter Sarah Bache: to be equally divided between them, or such of them as should be living at the time of his death. Thomas died before his father, and of course the property went to the four others. By a previous clause in this will, the testator had given to his daughter Alice an annuity of $500, in these words: " And as it has pleased Almighty God that my daughter Alice should have such imbecility of mind as to render her incapable of managing or taking care of property, my will further is, that she be allowed for her maintenance the sum of five hundred dollars annually during her natural life; and that my executors, herein after named, pay out of the income of my estate to my said daughter Alice the said sum of five hundred dollars, in half-yearly payments, to commence immediately after my decease." In 1808, Anthony Lispenard, one of the devisees, died, unmarried, *intestate*, and *without issue*, and consequently his sister Alice succeeded to *one-fourth* of his estate, or *one-sixteenth*

of the estate whereof her father died seized and possessed, which is understood to be very valuable.

Those of the heirs at law of Alice Lispenard who opposed the admission of her will to probate, insisted that at no period of her life had she sufficient mind and understanding to entitle her to make a legal disposition of her property. The proofs adduced are very voluminous; of which the following is an analysis:

The due execution of the will was proved by the subscribing witnesses, who testified to the capacity of the testatrix to make a will.

On the part of the objectors it was proved by connections of the family of the testatrix, and by others, that from early life Alice was incapable of taking care of herself; that she was washed, nursed and put to bed the same as a child, until she attained the age of twenty-two or twenty-three years, and that they believed her to have been an idiot. They described her as having a foolish manner of hanging her head; that she had a vacant expression of countenance; a silly and unmeaning laugh, when spoken to; that the carriage of her body was awkward and unnatural, and that she dribbled at the mouth; that her temper was violent, and her language occasionally abusive.—That all attempts to educate her were abandoned as impracticable; that she was not permitted like the rest of the children of the family, to see company, but was kept out of sight; her food was put upon her plate at the table without being asked what she would have, and no one thought of entering into conversation with her: she being deemed incapable of conversation upon any subject; and, in brief, that she was always treated as a child. She was born in 1781, and lived with her father until he died, in 1806, and then resided with her brother Leonard until 1813, when she was put out to board with strangers, and continued with them until 1827. The same account, substantially, was given of her during the time she boarded out. In

1841.

Stewart's Executor
v.
Lispenard.

1816 and 1817, when she was upwards of thirty-five years of age, she spent her time in sitting at the window of the house where she resided, without conversing with any one; and would sit there even when the shutters were closed. She would fly into a passion on the most trifling occasions, would cry like a child when the children of the family in which she boarded refused to divide their candies with her, and could not be taught the Lord's prayer. From 1817 until 1827, she continued to cry when she had not her share of cake and candies, was helped at meals like a child, eat her food greedily and voraciously, was washed, dressed, and put to bed like a child, was not permitted to go into the street alone, and generally was treated as an idiot. When in a rage, she would strike those about her, and would be sen' ' her room and kept there until she promised to behav.      'r.

In support of the application to admit the will to probate, it was shewn that until the age of eight or nine years, Alice had as much intellect and intelligence as children generally, and partook in the sports and amusements of children; that she learned to spell and could read a little in the spelling-book, but was inattentive, and her father would not permit her preceptress, employed as a teacher in the family, to insist upon her applying herself to her studies, and after an ineffectual effort at a school in the neighborhood to educate her, all attempts in that respect were abandoned. Her temper was very bad; she was sullen and obstinate, would cry when her play-mates offended her, run in and tell her father, who would coax her and indulge her in all her whims. Her parents did not attempt to control her; on the contrary, she controlled her parents, giving them no rest until they yielded to her wishes. She was permitted to drink as much strong beer as she liked, and subsequently wine and brandy. She soon became daily intoxicated. This course of conduct was continued during the life-time of her father, and whilst she resided with her brother Leonard she was still indulged in the

use of strong drinks, but not to the same extent as du- **1841.**
ring the life-time of the father. She was voracious in her
appetite for food, took no exercise, and became very Stewart's Ex-
ecutor
gross in her person; she was very near sighted, and the *v.*
Lispenard.
defect in her vision gave her an awkward appearance,
holding objects obliquely close to her eyes, besides she
had the habit of stooping and looking down. She would
hold intercourse only with her intimate acquaintance, and
in the presence of strangers was taciturn and reserved.
Visitors judging from her appearance and manners and the
way in which she was treated by the family, generally
considered her an idiot. After she went to board with
strangers, she was still indulged in her propensity for
strong drinks, but was limited to three or four glasses of
wine per day. In 1827, her brother-in-law A. L. Stewart
took her into his family, where she continued to reside
until her death in 1836. By degrees, her habits of intem-
perance were corrected, and for four or five years previous
to her decease, she wholly abandoned the use of strong
drinks. She also learned to control her temper; for some
time after her removal into the family of Mr. Stewart,
she exhibited the irritability of her temper, and beat the
children of the family, when by way of punishment, as
had been done whilst she was at board, she was sent to
her room. When however, she ceased to be intemperate,
these occurrences seldom happened. She was admitted
by Mr. Stewart to his table, and was treated with kindness
and attention by himself and his family. Various little
duties were assigned to her, all of which she discharged
with judgment and discretion. She was given the key of
a closet, in which were kept necessaries for house-keeping
which she furnished to the servants, and when the stores
required replenishing, she would mention it. She was
made the messenger between the family and the office of
Mr. Stewart, kept in his dwelling-house, to obtain money
to pay current expenses, which was always given to her
on her request, and when money was wanted for purcha-

1841.

Stewart's Executor
v.
Lispenard.

ses made on her own account, she would state the amount and direct it to be charged to her, and the residue to the family expenses. She had charge of the clothes given to the washer-woman from week to week, and would give the necessary directions, and when mistakes occurred on the return of the clothes, would detect and have them corrected. She took charge of her own clothes, and was very careful of them; if they wanted repairing she would give them to the sempstress, and when they wanted replenishing, would say so. In the absence of other members of the family, she would give directions to masons and carpenters employed in making repairs and alterations about the house, who obeyed her, and invariably found that what she had directed was approved. In like manner she would give directions to the servants to carry messages, who obeyed her the same as any other member of the family; she kept eye upon them, and reported their misconduct to her neice, who was at the head of the household of Mr. Stewart. Whilst she resided with Mr. Stewart, she repeatedly recognized individuals with whom she had been acquainted in her youth, and whom she had not seen for many years, called them by their names, made inquiries respecting particular members of their families, and recurred to the scenes and amusements of her youth, her father's place and garden, fruits, &c. She would inquire of individuals living at a distance, who were in the habit of visiting at Mr. Stewart's, as to the health of particular members of their families with whom she was acquainted. In one instance, on the return of a clergyman from Europe, where he had gone for his health, she congratulated him on his return, asked whether his health was improved, and inquired how his wife, who had accompanied him, had stood the voyage. She was observant of occurrences in the family, and predicted that a marriage would take place between one of her nieces and a suitor who had long been intimate in the family, whom she told from his increased attention to her neice, " you will be my nephew some of

these days;" and after an absence of six weeks on a bridal excursion, she reminded him of what she had said. She was in the habit of riding out in public carriages, and would station herself at the window, to watch for the carriage in which she usually rode, and when it approached, would recognize it. A brother of Mr. Stewart was in the habit of relieving poor people, and when they called to see him, she would go into the office and inquire for him, and observe that some of his *customers* were in the entry, asking what she should say to them. Whilst she resided with Mr. Stewart, her sister Sarah, the wife of Mr. Stewart, died, and after her death she frequently spoke of her with regret. She often spoke of her having property. When vexed by the servants, she would threaten to leave Mr. Stewart's family, saying that she had property, and was not dependant on the family. Upon one occasion, previous to 1827, when two of the daughters of her brother Leonard had called to see her, she observed they do not care any thing about me; they only hope when I die to get some of my property; but none of them shall have any had been very kind to her. At another time, speaking any thing but my brother and sister Stewart, who she said, of her relatives, other than Mr. Stewart's family, she said that they should not have a cent of her money; that her brother, as she usually called Mr. Stewart, should have it all; that he had been a good friend to her; and at the time of the execution of her will, she expressly declared that she wished to leave what she had to Mr. Stewart. There was no evidence, however, that she had any idea of the extent of her property, or that she ever called Mr. Stewart to an account in respect to it. There were many witnesses examined on both sides: those called in opposition to the granting of probate generally, expressing the opinion that she was *wholly incapable*, whilst those produced in support of the application for probate, expressed the opinion that she was *fully capable* to make a will. Most of the former class formed their opinions of

1841.

Stewart's Executor
v.
Lispenard.

the mind and understanding of Alice, from her appearance, peculiar manner and deportment, as exhibited previous to her removal to the house of Mr. Stewart, when she was looked upon and treated as an idiot: they having had no conversation with her, deeming her incapable of conversing rationally on any subject; whilst the opinions of many of the latter class of witnesses were formed after her removal to the house of Mr. Stewart, where she met with kindness, attention and respect, and was treated like a rational being. Several of these latter witnesses stated that their impressions as to the state of the mind of Alice when they first saw her were very unfavorable, but from constant intercourse, and frequent and familiar conversation with her, those impressions had been removed, and they had come to the conclusion that, though her mind was not naturally strong, she possessed ordinary reasoning and discriminating faculties, and in confirmation of their opinions, many of the facts above detailed, shewing that she was endowed with *reason* and *understanding*, were related by them.*

The surrogate, on the 26th day of July, 1838, made a decree, refusing to admit the will to probate. Whereupon Robert Stewart, *executor* of the last will and testament of Alexander L. Stewart, (the latter having died during the pendency of the proceedings before the surrogate,) *appealed* from the decree to the Hon. Ogden Edwards, circuit judge of the first circuit, who, on the 24th day of August, 1839, *affirmed* the decree of the surrogate; which decision was confirmed by the Chancellor on the 17th day of June, 1841, after an appeal to him from the decision of the circuit judge. The executor of A. L. Stewart thereupon appealed to this court.

---

* The above analysis of facts, has been prepared with great care, from a voluminous case of upwards of 300 pages; but in view of the importance of the principle established by the decision of the court for the correction of errors, and to enable the profession to see the evidence in detail, a copy of the case has been deposited in the *State Library* at Albany, entitled "The Lispenard Case."

To the proper understanding of a transaction alluded to in the opinions delivered by the surrogate and by the Chancellor, it is necessary to state, that after the death of Anthony Lispenard the younger, by which event Alice became entitled to *one-sixteenth* part of the estate of her father, she, by formal deeds, bearing date 6th January, 1808, conveyed to her brother *Leonard*, and to her sister *Sarah*, the wife of *Alexander L. Stewart*, all the estate, real and personal, so acquired by her upon the death of her brother Anthony, in consideration of an annuity of $1,000: half of which was secured by the bond of her brother Leonard, and the other half by the bond of her brother-in-law. In 1815, it seems that Robert M. Livingston, and Sarah his wife, (which Sarah was the granddaughter of Anthony Lispenard, senior, and one of the devisees named in his will,) being dissatisfied with the conveyances thus made by Alice in 1808, threatened some legal proceeding on the ground of the alleged *idiocy* of Alice; and that to quiet such proceeding, the sum of $10,-000 was given to them by the parties to whom the conveyances were executed, and they, on their part, released to Leonard Lispenard and to Sarah Stewart the *lands* whereof Alice became seized on the death of her brother Anthony, and all the interest which they then had or *might thereafter have* in the *personal estate* which Alice acquired on the happening of that event, and which, by the deed of 1808, she had conveyed to her brother Leonard and her sister Sarah.

The following opinions were delivered by the SURROGATE and by the CHANCELLOR. It is understood that a formal opinion was not delivered by the circuit judge at the time of the decision made by him.

*By the* SURROGATE. This will has been propounded by the executor in the usual form; and its admission to probate was resisted by some of the next of kin on the ground

1841.

Stewart's Executor
*v.*
Lispenard.

1841.

Stewart's Executor
v.
Lispenard.

that the testatrix was at no period of her life possessed of sufficient mind and understanding to qualify her to make a legal disposition of her property.

The issue between the parties involves the question of capacity; the inquiry has been laborious and protracted; the testimony taken, exceedingly voluminous; and both in conducting the proceedings, and on the final argument, great professional skill and ability have been exercised and displayed by the contending advocates.   Owing perhaps to the over-anxious solicitude of the parties, the testimony has been swollen to an unusual and unnecessary size.   On examination much of it will be found to be merely cumulative, some of it irrelevant, and a larger portion still, trifling and unimportant.   Had but half the number of witnesses been examined and the evidence been reduced to a quarter of its present bulk, no material injury would have been sustained by either party.

As is usual in cases of disputed capacity, there is in the present case a considerable conflict of opinion among witnesses equally intelligent and deserving of credit; but on the facts proved, and the acts done, (and on those alone the case must be decided,) there is less of contradiction and discrepancy than could have been anticipated.   Before proceeding to an examination of the testimony, it may not be improper to state in this place a few general principles which are to govern in the decision of this case, and which are calculated to remove some of its apparent difficulties and contradictions.

1. Negative witnesses cannot prevail over positive.

2. Mere opinion or general statements not instructed with facts and circumstances, are entitled to little weight or consideration.

3. The credit to be given to the testimony of witnesses, other circumstances being equal, should be in proportion to their opportunities and abilities of judging.

The life of Alice Lispenard may be divided into three periods: the time she lived in her father's house; the time

she was sent out to board with strangers; and the time she
lived in the family of her brother-in-law, Mr. Stewart; and
in this order the evidence may be examined and compared.

It is unnecessary to go back to the infancy of Alice, or
to consider her condition before she attained her eighth
year. Anterior to that age, the difference in capacity be-
tween her and her companions of a similar age, was not so
great, and had not yet manifested itself so strongly as it
did at a later period. It is no uncommon thing to see
children whose looks in early life are heavy, and indica-
tive of dullness and stupidity, prove afterwards to be per-
sons of excellent understandings.

Alice was possessed of the five natural senses which are
generally regarded as the inlets of knowledge; she had ac-
quired the faculty of speech that requires some degree of
mind and memory; and hopes were entertained by her pa-
rents that she was capable of improvement, and of receiving
at least the ordinary rudiments of instruction. A teacher
in the house was provided, under whose charge she was
placed; the attempt of instructing her was commenced,
and was no doubt anxiously pursued for some time, when,
to the great grief of her parents, the experiment failed;
and the extraordinary and mortifying fact was disclosed
that Alice was incapable of being taught to read, and much
less to write. The utmost length to which she ever pro-
gressed was to spell words of two syllables; and it is very
remarkable, that when more than forty years afterwards
the attempt was renewed by Mrs. Stewart, the result was
attended with no better success, and the same number of
syllables again proved an insuperable barrier—the *ne plus
ultra* of advancement. Her parents perceiving that all
their efforts to impart instruction were unavailing, and only
had the effect of rendering her unhappy, were finally com-
pelled to abandon the attempt as altogether hopeless.

From the school in the house, she went with her sister
a quarter or two to a school in Dutch-street, more proba-

*1841.*

Stewart's Ex-
ecutor
*v.*
Lispenard.

1841.

Stewart's Executor
v.
Lispenard.

bly with a view of accompanying her sister and accustoming her to female society, than with any expectation of being instructed.

At this epoch of her life, her mental defects became apparent and striking; and she passed from adolescence to womanhood, possessing the body of an adult and the mind of a child.

Mrs. Satterthwaite, who had frequent opportunities of seeing her, and who, being older, was capable of observing and judging, describes Alice, when between twelve and fifteen years of age, as having a vacant expression of countenance, a foolish manner of holding her head, dribbling at the mouth, a silly laugh when spoken to, and generally answering in monosyllables; requiring a person to attend her—unable to take care of herself—and washed and put to bed like a child—incapable of being instructed, and never joining with the rest of the children in their sports and amusements.

William Baldwin, who lived with her father ten years, and who during this period saw Alice every day, confirms this description, and adds that she knew nothing of the value of money; had seen the experiment tried, when she preferred a sixpence to a dollar, and that too when she was between sixteen and eighteen years of age. She was generally crying, and was voracious and immoderate in her eating and drinking.

Mrs. Elizabeth Stanton, who was a companion of the oldest daughter, Helen, and who was about twelve years older than Alice, represents her appearance as that of an idiot; and that as she grew up she was different from other children, never joining them in their little plays and diversions; was of a sullen and quarrelsome disposition—would get angry and cry for the slightest cause; and whether pleased or the contrary, exhibiting pretty much the same expression of countenance.

To meet this testimony in relation to the earlier period of Alice's life, the following witnesses have been brought

forward and examined.  Mr. James Davidson, Mrs. Isa- 1841.
bella Lee, Mrs. Elizabeth Brower, Mrs. Jane Martin, and
Mrs. Jemima Vreeland, all worthy and respectable per- Stewart's Ex-
ecutor
sons, but whose means and ability of observing and judging v.
Lispenard.
of the actions and character of Miss Alice were certainly
inferior to those produced on the other side.

Mr. Davidson, a gentleman eighty years old, in the year
1795 lived in the neighborhood of Mr. Anthony Lispenard,
and in his occasional visits to the family, saw and became
acquainted with Alice.  At first, he said she was very re-
served and shy; but this after a few meetings wore off,
and she became easy and familiar.  In their walks through
the garden and their visits to the green-house, she would
point out what she thought worthy of notice, and would
discourse about the plants and fruits.  Her appearance was
that of a person indulged and humored in every thing she
wanted; and with respect to her going to school, he says,
she went or stayed at home just when she pleased.  The
old gentleman, in making this last observation, it is pre-
sumed, was not aware of the fact that the school happened
to be kept in the same house.  The other witnesses were
companions and playmates of Miss Alice, and all of them
her juniors in years.  The recollection of events occurring
before the age of ten, after the long lapse of forty-five
years, must necessarily be obscure, uncertain, and imper-
fect; and although not absolutely to be rejected as evi-
dence, should always be received with great caution and
distrust.  Every one's own experience will testify how
vague and unsatisfactory are such reminiscences, and
how apt they are to be mixed and confounded with in-
formation and impressions subsequently acquired and pro-
duced.

One of these witnesses, Mrs. Elizabeth Brower, appears
to have been sensible of her own incompetency in this re-
spect, and when asked whether she observed any difference
between the understanding of Alice and of other children,
very properly and discreetly answered, No I did not at the

time, I was a child myself; and perhaps with great truth and propriety some of the other witnesses might have made a similar confession.

The testimony of Mr. Davidson and of these female witnesses, is of a general and negative character, and does not contradict in any one essential or important particular, the statement rendered by the previous witnesses. There may, indeed, be found some variation in their relations, in some minor or subordinate matters, such for example, as to her joining and participating in the sports and amusements of her companions; but as every difference is not a contradiction, it is easy to perceive that both representations may be correct, or nearly so; and if this distinction had been kept in mind, a great deal of discussion might have been spared, if not altogether avoided.

We are told by one of these witnesses, Mrs. Isabella Lee, that in playing school, Alice would act the madam and punish the other children if they did not know their lesson. To show how happily and aptly she performed the character of a pupil, I would refer by way of contrast to the testimony of Mrs. Elizabeth Stanton, where it is stated, when they were trying to teach her, she would get into a passion, throw the book at her teacher's head, and refuse to say any more of the lesson.

In 1806, when Alice was in her twenty-fifth year, her father, Mr. Anthony Lispenard, died; having first made and executed his last will and testament, by which, after making provision for the support of his wife and his daughter Alice, he leaves all his estate, real and personal, equally between his sons Leonard, Thomas, and Anthony, his daughter Sarah and his grand-daughter Sarah Bache. With respect to his daughter Alice, it contains the following remarkable provision: "And as it has pleased Almighty God, that my daughter should have such imbecility of mind, as to render her incapable of managing and taking care of property, my will further is, that she be allowed five hundred dollars for her maintenance during her natural life." Here

is the solemn and deliberate judgment of her father him-
self, who, above all other persons, was best acquainted
with the character of his unfortunate child; and made too
at a period when there was no contest about property, to
alienate the affections, harden the heart, and influence the
judgment.

The propriety and correctness of providing in this way,
for his daughter was assented to by the friends and ac-
quaintances of the family; nor was it ever known or heard
that the other children accused their parent of injustice in
not leaving their sister an equal portion of the estate.

In the course of this investigation, a charge deeply af-
fecting the character of this gentleman has been made,
from a quarter that was hardly to have been expected.
Upwards of thirty years have passed away since his remains
have been consigned to the grave, when some of his own
descendants undertake to prove that the imbecility, which
he refers to the act of God, was occasioned by his own
mistaken indulgence, in neglecting her education; and,
what is still more incredible, by the direct encouragement
which he afforded her in early life, in gratifying a propen-
sity to excessive drinking. The justice of the case, and a
due respect to the memory of Mr. Lispenard, equally de-
mand that an accusation so serious and extraordinary
should be fully and deliberately examined.

Mr. Lispenard was a gentleman of education himself,
and was not insensible of its utility and importance. He
gave all his other children a good education, and as it was
not convenient to send Alice to a public school, he procur-
ed a private teacher for her in his own family. To ascribe
her inability to be instructed, to his improper indulgence,
rather than to natural and constitutional weakness of mind,
is unreasonable and contrary to all probability. He fur-
nished her with all the means and opportunities of im-
provement; and what more could be expected of him? but
he was unable to give, what her Creator for inscrutable
ends had withheld, an understanding capable of receiving

instruction. He was a kind and indulgent parent; and towards Alice he might have manifested a more tender affection than to his other children, because she was more helpless, and stood in greater need of assistance and attention. This kindness, proceeding from feelings of compassion, was only the consequence and not the cause of her deficiency. If Alice had been like other girls, after coming to years of reflection, she would of her own accord have made the necessary exertions to remove the opprobrium and disgrace of not being able to read and write.

It is undoubtedly a fact, that Alice, in early life, manifested an inclination to drink; and this, together with her voraciousness in eating, may be regarded as evidences of unsoundness of mind. The first witness who speaks of this fondness of drinking, and of her being more indulged in it than was proper or becoming, is Mrs. Elizabeth Stanton. What she says on the subject is very vague and general; she gives no particulars as to the quantity drank, or whether the habit commenced at the time she went to school, or at a subsequent period. She herself never witnessed the effects of drinking on Alice; she had only heard of them. The next witness who testifies to the habit of intemperance, and of its encouragement by her parents, is Phœbe Thompson, a colored woman:—she states that her intemperance was habitual; that for years, it commenced every day about 10 o'clock, and continued until night; and that from ten till one in the day was the worst time; that she never knew her to be sober a whole day; and that her father and mother, instead of restraining her, encouraged her in the habit. Her drink was at first beer, and afterwards either brandy or spirits: she at first used to reel or stagger when under the influence of liquor; but she got so accustomed to drinking, that she at last never walked straight. That every day about twelve o'clock, Alice brought from the house to the kitchen the liquor that was measured out for the servants; each servant had his own cup—and if she thought any one had already enough, she would withhold

his share. Drunk every day, and at twelve o'clock, when <span style="float:right">1841.</span> in the worst state, bringing and measuring very carefully the liquor to the servants!—A statement so improbable, absurd, and contradictory, carries with it its own refutation, and only injures the cause it was intended to sustain. Baldwin, who kept the keys of the wine and beer cellar, and of the sideboard, says that in her earlier days she did not drink to any excess; and that it was not until she was about twenty years of age, long after her school-days, that she began to take too much. That on discovering this inclination, so far were her parents from giving it any encouragement, that no wine or liquors were suffered to stand on the sideboard; they were kept under lock, and a moderate allowance was furnished to her two or three times a day;—a glass of wine at dinner, and sometimes a glass of brandy and water after. For two or three years previous to her father's death, she was never permitted to help herself. Mrs. Charity Hendrickson, a nurse in the family of Mr. Leonard Lispenard, gives pretty much the same representation: she says that Alice was a woman grown when she went to live there, and that she was disposed to drink too much, if she could get it; evidently implying that she was put under restraint. It should be recollected, that in Mr. Lispenard's time, drinking during the day, and particularly at dinner, was a much more common practice in families than at present. We have lived to see a great moral reform in this respect, which it is hoped will arrest the future progress of this degrading and destructive habit.

As Alice was a large, unwieldy woman, taking but little exercise, and eating too much, a certain quantity of drink was probably considered as conducive to her health; and under this persuasion more perhaps would be sometimes given than was either necessary or beneficial.—And it would no doubt occasionally happen, when the proper precautions were neglected, and she should get access to it, she would indulge too freely.—That the habit of intemperance was never fixed or established, and that she was

Stewart's Ex-<br>ecutor<br><i>v.</i><br>Lispenard.

in this respect easily controlled, appears clearly and satisfactorily from the whole subsequent course of her life. If at any time after her father's death she drank too much, it was when she was staying a few months in the house of Mr. Stewart himself, in the time of Elizabeth Barker, who deposes that besides beer at dinner, she gave her three glasses a day of brandy and water, and that very strong, sometimes two wine-glasses full at a time. When she lived with Mrs. Freeman, she was allowed four glasses of wine and water a day; at Mrs. Goodwin's three glasses; and at Mrs. Taylor's the same quantity. An allowance so small as was testified to have been furnished in these three last families, could not possibly be productive of any injurious consequences: and it might be regarded as moderate, even by one who adheres to the practice of total abstinence. For the long period of fourteen years was she limited to the like quantity; and yet strange to relate, Mrs. Stewart declares, that when Alice came to live in her father's house, her habits were intemperate, and continued so within four or five years previous to her death. This statement of Mrs. Stewart cannot be correct; and the only way to account for it is, that she confounds the propensity with the habit. The inclination she most certainly had;—it was never eradicated—and she would always gratify it whenever she could get the opportunity.

From all these facts and reasonings it conclusively appears, that Alice's imbecility of mind was neither owing to a neglected education, or to early unrestrained indulgence; but in ascribing it to the will of God, her father assigned the true and only cause.

After the death of her father, Alice lived in the family of her brother, Leonard Lispenard, about seven years. During this period nothing very particular or material is related of her. Mrs. Charity Hendrickson, who lived in the same house at this time, says, that she neither believed her to be a perfectly sensible woman in all things, nor a perfect idiot. In 1813 we find her boarding with Mrs.

1841.

Stewart's Executor
v.
Lispenard.

Hewlett, where she lived about five years. The only witnesses who testify of her during this time are Mrs. Harriet G. Freeman, the daughter of Mrs. Hewlett, Mrs. Lucretia Burtsell, the sister-in-law of Mrs. Freeman, and Mr. William Browning, a boarder in the house. Two of the witnesses living in the same house, had daily opportunities of observing her; they are all disinterested, intelligent, and respectable; and in what they state they saw and remarked, they have not been contradicted. Miss Alice is described by them as being awkward in her appearance and attitudes, and sitting alone day and night by the window, whether open or shut; holding no conversation with any body; as extremely passionate, and crying, on the most frivolous occasions, like a child, and sometimes for no greater cause than not giving her candies. In her eating she was voracious, and would consume whatever was put on her plate, whether more or less, so that it was found necessary to put her under restraint.

At Mrs. Goodwin's, where she lived for a year after leaving Mrs. Hewlett, she is represented by Mrs. Stanton as knowing nothing of the value of money, and as incompetent to take charge of an ordinary house, to sew, or to make purchases for herself.

From this last place Alice was transferred to the house of Mrs. Taylor, under whose care and charge she remained for the long space of eleven years. The witnesses who depose, in relation to this particular time, on the part of the next of kin, are Mrs. Helen Gray, the daughter of Mrs. Taylor; Mrs. Maria Taylor, a daughter-in-law, and Henry B. Taylor. All of these witnesses are of unexceptionable character; and with their means and opportunities of information, their relations are entitled to the fullest credit. A more helpless, weak, and degraded being can scarcely be imagined, than Alice is described in their testimony. Mr. Stewart first paid Mrs. Taylor five dollars a week for her board, which he afterwards, (for what cause is not explained,) had reduced to

twenty shillings or three dollars a week.  In obedience to his directions, Alice was made to carry up to her room wood and water, in order to keep her in exercise; and she submitted to this drudgery without the slightest murmur or complaint.   When she misbehaved, Mrs. Taylor would order her to be confined to her room, there to remain until sent for; and to this also she would  submit without offering the slightest resistance.   She was unable to keep either her person or her clothes neat and tidy;  they had to dress her like a child; and it was some years before she could be brought to wash herself in the mornings with cold water. At meals she would sometimes eat so fast and voraciously, that Mrs. Taylor would  have to strike  her on the back to keep her  from choking.   She was totally unacquainted with the value or use of money.  Mrs. Taylor tried to teach her to distinguish a two shilling piece from a half dollar, but was never able; and when  offered money, she has been known to prefer a cent to a half dollar.   When irritated, she could be pacified with a promise of sugar candy; and if she was disappointed in getting it she would cry like a little child.

Two of Mrs. Stewart's daughters were married during the time Alice was living with Mrs. Taylor; but she was not present at the wedding of either; and it is fair to presume that she was not invited.

This is a brief summary of the testimony of these witnesses; and that it is but feebly and unsuccessfully encountered by such witnesses as Margaret Murden, Sarah Warner, and Isabella Bard, will hardly be denied by any one who will take the trouble of examining.

Passing over their inferior opportunities of observing, the testimony of the last named witnesses is liable to the same objections urged against some of the former ones. They do not directly contradict the statements made by the other witnesses, nor do they present facts or circumstances that are inconsistent with their representations, or that even render them improbable.   For instance, Mrs. Helen

Gray deposes that Alice on one occasion was found choking her little son about six years old, until he was black in the face. Is this fact thus positively stated by a credible and unimpeached witness contradicted or rendered doubtful, because Mrs. Warner sometimes committed to Alice the care of her own little child, when no similar attempt to injure was made, and no bad consequences ensued? Again, nothing is better established than that Alice was not entrusted with her own money, and that all purchases were made for her. Is this fact impugned or in any degree weakened by the same witness stating that on one occasion, Alice accompanied by herself and by one of Mrs. Taylor's daughters, laid out three or four shillings in the purchase of pins, needles and thread?

In the selection of the several places where Alice was sent to board, she appears never to have been consulted. The families with whom she lived were all decent and respectable, but some of them occupying only a part of a house, and none of them employing a servant—they necessarily did not possess those conveniences, comforts, and accommodations which her circumstances and condition of life gave her a right to expect.

The last stage that Alice made in the journey of life was in 1828, when Mr. Stewart took her into his own house. The days she passed in the house of her brother-in-law were the happiest and most tranquil of her life. She was treated with uniform attention, kindness, and respect by every member of his family; and if on some occasions it became necessary to control her by the exercise of a little authority, it was always done with good sense, moderation, and humanity. The principal witnesses who testify in behalf of the heirs at law of Alice at this period, are Sarah Ann Fisher, Isabella Henderson, and Jane King. These witnesses lived as domestics in Mrs. Stewart's family the last two years of Alice's life; none, therefore, could have better means and superior opportunities of noticing and judging. They all

1841.

Stewart's Executor
v.
Lispenard.

concur in representing Alice at this time to be the same dependent, helpless, and subservient being as formerly; incapable of rational conversation—exercising no self-government—passive under restraints, and submitting to be imprisoned in her room whenever it was ordered. The important fact that Alice was frequently subjected to confinement as a punishment when guilty of misbehavior, was first revealed by Isabella Henderson, and was afterwards confirmed and established by the testimony of the Taylors and Mrs. Stewart herself. Nothing has been alleged against the character of these witnesses, except their being called *discarded servants;* an epithet entirely unmerited, as there is no evidence that any of them were dismissed for improper or unworthy conduct.

In this stage of the investigation, the executor introduced a long array of witnesses, composed of physicians, divines, lawyers, seamstresses, washerwomen, carpenters, masons, coachmen, members of his own family, and occasional visiters at his house. Many of these witnesses had little or no acquaintance with Alice beyond exchanging the usual salutations when they happpened to meet; and not a few are to be found among them who scruple not to declare, that in point of understanding she was as sound and good as most people. Certainly witnesses who can render such testimony are unworthy of serious attention; not that they intend to swear falsely, but because the opinion they express is inconsistent with admitted facts in the case; and is moreover contradicted by higher and better testimony on the same side. Vague generalities and opinions, accompanied by no specific facts, actions, and circumstances, characterize this testimony on the part of the executor; and when properly weighed and analyzed will be found to amount to little more than this—that Alice had her prejudices and attachments, and was not insensible to neglect or attention—that she could remember persons whom she had not seen for a long time—that she could carry and bring back messages with accuracy and a kind of mechanical

precision—and that she could make and answer inquiries and questions on trite and familiar subjects, such as the state of the weather and of health. Now the ability to do all this, and even more, is not incompatible with great imbecility of mind; and in confirmation of this opinion I cite from 1 *Hag.* 384, *Ingram* v. *Wyatt*; the observations of that learned, able, and upright judge, Sir John Nichols:

1841.

Stewart's Executor
v.
Lispenard.

" When imbecility is original or connate, the memory is often perfect, especially in trifling and simple circumstances, though the other mental powers remain *infantine.* The brain has never developed itself. In such an individual, some improvement may take place; some progress in knowledge beyond mere infancy will have been made, by the help of memory, by imitation, by habit. Such a person will recollect facts, circumstances, and places, and hackneyed quotations; will conduct himself orderly and mannerly, and will make a few rational remarks on familiar and trite subjects."

Of the little importance to be attached to mere opinion, it will perhaps not be useless or inappropriate to adduce one or two instances by way of illustration.

Doctor Neilson, one of the subscribing witnesses to the will, a respectable man, and a physician of high reputation, many years ago at the request of Mr. Stewart, gave the following certificate: " I have had frequent opportunities of conversing with Miss Alice Lispenard, and judging of her mental faculties, and am of opinion that her natural powers are sufficiently good for any transaction which requires memory or judgment; and if her education had been carefully attended to, she would at this time be a useful member of society." The opinion here expressed is explicit, ample, and unqualified; and coming from so respectable a source, if not satisfactory, was at least deserving of high and serious consideration. But how does every thing that is material or important in this certificate vanish in the doctor's cross-examination: " I often (I quote his words) conversed with

her, but did not find her of *ordinary* understanding. I believe she was a weak woman; but whether she was capable of buying or selling I cannot answer, as I don't know that that duty was ever put upon her." Again: " I have been present when she was transacting business, such as the after duties of the table, in washing *cups and saucers*, and attending to household concerns. I don't know that I have ever seen her engaged in any other household transactions than washing cups and saucers."

The second example of the futility of opinion, is furnished from the testimony of the Rev. Charles S. Stewart, the son-in-law of Mr. Stewart, a respectable clergyman, and well known to the public and the literary world, by his useful and entertaining writings. In answer to a question put him on his cross-examination respecting Alice's religious knowledge and instruction, he says, " Her confession of guilt might have implied a knowledge of depravity of nature, the necessity of forgiveness, and the ability of God to forgive in any circumstances, might (when instruction had been received, as was the fact in her case,) imply a knowledge of the atonement of Jesus Christ. Prayer is a means means by which we receive the influence of the Holy Spirit; and as she said she constantly prayed, it may naturally be inferred that it was for that influence." Turn now to the testimony of Sarah Ann Fisher. In reply to a question, why she thought Alice had no idea of a Supreme Being, she observes, " I have often taken the Bible, and in reading it to her she did not understand. When I would read it to her, she would ask what was the meaning of Christ, and ask who Christ was? She would then turn around and laugh, and say, ' Oh, you devil;" and then would go down stairs laughing, and perhaps she would laugh till she got down to her room." What a commentary is this on sentiments thus gravely and solemnly expressed, and what an illustration does it present of the immense difference between *opinion* and *facts*.

If some of these witnesses had been duly informed of the extent of Alice's deficiencies, they would not probably have been so ready to express themselves in favor of her understanding.

1841.

Stewart's Executor
v.
Lispenard.

Dr. Greaves, one of the medical gentlemen who gave a certificate to the same effect as Doctor Neilson, being asked whether he knew she could read? answered, "I do not, and did not inquire; I should have thought it an insult to have asked her;" evidently showing by his answer that he took it for granted that she could; whereas nothing is better established, notwithstanding all the pains taken and efforts repeatedly made, that she was never capable of being taught to read.

I quote the evidence of Mr. Averill, a very respectable and intelligent witness produced in behalf of the executor:

"Q. Do you suppose it was possible to teach her to repeat and understand the Lord's prayer?

" Ans. Yes; I think there is no question but she could have been taught.

" Q. If the attempt had been made, and had failed, would that alter your opinion of her intellect?

"Ans. Yes."

Yes, Alice could listen to the stories of the nursery, and could repeat some of the simpler rhymes from the melodies of Mother Goose, but the Lord's Prayer she never was able during her whole life to commit to memory!

It is amusing to observe how some of these witnesses occasionally overshoot the mark, by relating, as proof of her understanding, observations and actions from which a reflecting person would draw an opposite conclusion. Examples of this kind may be found in Mrs. Stewart's testimony—but I shall not cite from her at present.

Betsey Stockton, a colored woman, " I recollect of her coming in one day when I was busy, and she said, ' What are you about?' I observed, I am going to be married; and she said, ' You are going to die one day and get mar-

ried the next; I would rather see it than hear tell of it;' and then she turned up her nose, giving her head a toss, and went out laughing. One very cold day there was to be some person baptized, and she said she would not be a Baptist, to be baptized on such a day—and laughed, and asked if they dipped them the same as they dipped candles?' and the witness adds, " she spoke of the whole thing with derision."

Again—to the question whether she saw Alice frequently during her last sickness, the same witness says, " I did; I was with her most of the time; she talked as other people talk. If she wanted any thing, she would ask for it. If medicine was given to her she would take it. I think it was the second day after her attack, she thought she was better, and got up; she walked towards the window, and looked out, and said that when her sister died, she had a large funeral; she said they *put* her in a *coffin* with a silver plate with her name and age upon it; and that when she died she would like to be put in such a coffin, and laid in the same room which she said was the spare room. She spoke of dying several times; one time she called out, ' I wish I was dead,' impatiently; she appeared to be in pain. I told her it was wrong—she ought to try to be patient; she said she could not help it, and asked me if I thought there was any pain in heaven ? I told her no; ' well,' said she, ' I don't know what sort of a place it is.' "

So Hannah Norman: " I have seen her take a book in her hand and look at it for an hour at a time. I never saw her read, but I believe she could read."

Another instance of this kind may be taken from the testimony of Mr. Edmonds, one of the most circumspect, scrupulous, and judicious witnesses examined in the course of this contest; these are his words: " she was given to strong passions. I have seen her come into the office about dinner time; she had some two or three doors to pass through, and before I saw her I have heard a tremendous

slamming of the doors;—she would say that her dinner was ready, and that was just the time her brother chose to send her of errands—and she would appear to be so angry as hardly to be able to give utterance to what she had to say; it was soon over, however. I have seen her shortly after, and she appeared to be in good humor." These sayings and actions of Alice require only to be stated; they speak for themselves, and no comments are necessary. As I may not have occasion to refer again to the testimony of Mr. Edmonds, I will take this opportunity of adverting to one particular part that demands a little notice: " Q. Did you ever leave her in sole charge of the office ? A. Yes. Q. In what did the charge consist ? A. In books, papers, money generally to a large amount, &c." If by the phrase, leaving in charge of the office, be meant, as it might imply, transacting any business of the office, Mr. Edmonds never intended to be so understood. Instead of saying she was left in charge of the office, the expression would have been more correct, that she was left in the office. The money in the office would be in no danger from Alice; she knew not the value or use of money, and she could therefore have no temptation to act dishonestly.

Mrs. Sarah A. Stewart, the daughter of the executor, and the wife of the Rev. Mr. Stewart, is certainly the most important witness produced in support of the will. The superior intelligence, amiable manners, and agreeable address displayed by this lady in her examination, are cheerfully acknowledged; at the same time I cannot but express my surprise, as well as regret, that standing in the relation which she did to the principal party in this case, and acting as the chief manager of the cause out of doors, in procuring witnesses and ascertaining their evidence previous to examination, she should ever have appeared in the character of a witness. If Mrs. Stewart did not know, she should have been informed by some discreet and judicious friend, that the active partisan and the disinterested wit-

1841.

Stewart's Executor
v.
Lispenard.

ness are incongruous characters, that do not well meet and unite in the same individual. Every important fact and allegation of the witnesses in opposition to the will, are not only uncontradicted, but are positively confirmed, in her ingenious and well related testimony, with the qualification that Alice's imbecility is ascribed to the mistaken indulgence of her parents, and the course of life she pursued. Alice was in her forty-sixth year, when she became the pupil of Mrs. Stewart; a pretty late period, it must be confessed, to commence the work of amendment and reform. Of the improvements alleged by her to have been effected, some of the examples on examination will be found to be trifling, others equivocal and none satisfactory. What, for instance, was more irrational than the declaration of Alice, after the death of Col. Webb's child, that she would never love another; and always afterwards showing great *aversion* to those children to whom she was formerly attached? Can any thing be conceived more silly than her practice of running to the street door whenever the bell was rung, and continuing to do so after repeated remonstrances to desist ? What conclusion is to be drawn from her repugnance to have the bible read to her, and leaving the room whenever she saw it taken up ? What more ludicrous than her conduct to the widow, in shaking her so hard on the dumb horse ? From her whole behaviour on that occasion, is it not manifest she regarded as serious what was merely intended as a joke ? What evidence of information or understanding does she exhibit in asserting that Mr. Montgomery Livingston had once tried to get a portion of her property, and that her brother had taken good care that he should not succeed ? And can any thing be imagined more weak and insipid, than her repeated thanks to Mrs. Webb for presenting her with a little jelly ? She frequently spoke of this act of kindness of Mrs. Webb, in bringing it to her; and every time she took the jelly she would remark, how kind she was to think of it.

The painful scenes of the death bed have been introduced by this and other witnesses in proof of her intelligence, but I apprehend to little purpose or effect. As it has been shown that Alice knew not her Saviour, how can it be pretended that she died in the hope or resignation of a christian ? But as little was given to her, little will be required; and there is every reason to entertain the belief, that through the mercies of a kind and compassionate Redeemer, she has passed from a life of humiliation, privation and non-enjoyment, to that happy state where sorrows never intrude, pain is never experienced, and pleasures, pure and unmingled, are forever enjoyed.

The necessity of engaging Alice in some occupation, to prevent her from sinking into lethargy and stupefaction, was early perceived. In her father's time she was employed in bearing messages, and carrying things between the house and kitchen; and afterwards, when she boarded out, she was required to discharge the more servile and laborious task of carrying wood and water. Under Mrs. Stewart she was appointed to act as a messenger between the house and office, and was assigned to perform the lighter and *less humiliating* duties of delivering out clothes for the wash, and of giving to the domestics soap, candles, and starch, and such other articles that need not be weighed or measured. Instead of complaining, Alice appeared to be pleased and flattered with her vocation; the keys of the pantry were displayed by her as the badges of authority; and to be applied to by the servants to deal out the different articles under her charge, inspired her with feelings of self-importance. The idea of keeping her in constant motion and exercise did not originate with Mrs. Stewart, although the credit is due to her of having carried out the system, with more kindness, perseverance, and judgment, than any of her predecessors. Acting continually under her direction and surpervision, Alice became more docile and tractable, and was improved in her temper and disposition. After great care and pains, she was at length taught

1841.

Stewart's Executor
v.
Lispenard.

to perform some little offices about her own person and clothes; and as she was in the daily habit of handling small change, she perhaps learnt, in process of time, to distinguish a sixpence from a shilling, or a two shilling piece from a half dollar. She, however, never possessed any adequate idea of the nature of money or of property. She was entirely ignorant of her own estate; of what it consisted, whether real or personal, or both; its value or amount; in whose hands placed, or where it was situated.

The declaration that she would sometimes make when excited by passion, that she had property and would remove elsewhere, proves nothing, even if it originated with herself; but there is every probability that this remark, like some more that have been ascribed to her, was caught from the other domestics who would naturally make the observation, or something similar to it, when they saw her every day busily engaged, and working like one of their own class.

No proof whatever exists that there was any improvement in Alice beyond the extent just mentioned, and all discussion consequently, as to the probability of a new development of intellect, is rendered wholly unnecessary. Had the testimony exhibited this woman asserting the right of locomotion, refusing to submit to the power they exercised of putting her under restraints, and of imprisoning her—calling upon Mr. Stewart to render her an account, and to pay the large amount of money in his hands belonging to her, and showing in a word, a determination that she was no longer to be kept in a state of pupilage—acts like these, if they did not establish a subsequent cerebral expansion, would certainly have afforded strong evidence of a change for the better. But who is so undiscerning as to not perceive that the very circumstance of Alice going through the daily round of drudgery imposed on her, was itself a strong and conclusive proof of want of understanding ? Who ever before heard of a person born a gentlewoman, of respectable connections, and possessing an es-

tate sufficient to maintain her in comfort and even in elegance, becoming a menial servant from choice, or as in the present instance, consenting to this degradation in compliance with the direction and wishes of an acquaintance or a relative ?

The counsel in support of the will, feeling the force of these facts, conceded on the argument what indeed could not well be denied, that Alice was exceedingly weak in intellect. But they urge that her understanding, small and circumscribed as it was, was sufficient to enable her to comprehend an instrument like the one under consideration— a mere simple donation, and made in conformity to the dictates of affection.

In answer to this reasoning, it may be remarked, with respect to the disposition of her property, that Alice, although treated with kindness by Mr. Stewart and his family, was not living on his charity, or in any way dependant on his bounty; and that she had other connections who had at least equal claims on her affections and much stronger on her sympathies. The children of her brother, Leonard Lispenard, born in affluence and nurtured and educated in the expectation of wealth, by the misfortunes of their parent were thrown upon the world poor and friendless. Mr. Stewart, on the other hand, by the exercise of shrewdness and judgment, and by good management, had improved and increased the estate originally derived from Mr. Lispenard, whose character has been attempted to be aspersed until by repeated accumulations it has become one of the largest in this city. To this person, possessed of a superabundance of estate, so as to be almost oppressed with its magnitude, Alice Lispenard, forgetting her poor and destitute nieces, by her last will and testament, leaves the whole of her property; verifying by this act, to the very letter, the words of the poet—

" Thou mak'st a testament
As worldlings do, giving thy sum of more
To that which had too much."

1841.

Stewart's Executor
v.
Lispenard.

The least quantity, or minimum of understanding requisite to execute a will of the simplest form and easiest of comprehension, can never be determined with mathematical accuracy or precision. However plain and simple it may be, the law requires that the person executing it should possess a sound mind, or that ordinary degree of understanding that renders one capable of taking care of his person and property; this is and always was the law, and Alice was incompetent to either. Her property was never in her possession, and was always managed by others; and as to her ability to take care of herself, it appears very clearly through life, in infancy, youth and womanhood, she required the same care, assistance, and attention, as a child. Her mind was naturally and constitutionally defective, and her incapacity was not the result of any cause, accidental or supervenient. She had some memory, but was destitute of judgment or the faculty of ratiocination. She was not a perfect idiot, which is rare and uncommon, but she was one of those that are more frequently seen who are denominated naturals, or simpletons; and, in the gradations between the two limits, of the lowest ordinary understanding on the one hand, and absolute idiotism on the other, she approached much nearer the latter than the former. Such persons, like infants, the law in its wisdom disqualifies from doing any legal act whatever, as the only sure and effectual means of protecting them from the frauds and impositions of the artful and designing.

In 1808, Anthony Lispenard, junior, being seized of one undivided fourth part of his father's estate, died intestate and without issue, by which event one-fourth of his personal estate, and one-sixteenth of the undivided patrimonial estate devolved on Alice by operation of law. The very same week her brother died, Alice, by two separate deeds, conveyed all her interest in the estate of the deceased, to her brother, Leonard Lispenard, and to her sister, Sarah Stewart, wife of Alexander L. Stewart, in consideration of four bonds for the payment of annuities of

two hundred and fifty dollars each during life. These annuity bonds are recited in the deeds, but it is a little extraordinary that not one of them have ever been produced in evidence in the course of this investigation. In this transaction, the judgment that Mr. Lispenard had pronounced in his will respecting his daughter's incapacity to manage and take care of property, was most amply confirmed. That the consideration, agreed to be paid, was notoriously inadequate, no better evidence is wanting than the fact, that when the transaction was impeached in 1815, by Mr. Montgomery Livingston and his wife, the sum of ten thousand dollars was paid to them by way of compromise; but admitting that the consideration paid was sufficient, was it right or fair in the grantees to give in payment of real estate their mere personal bonds without any other security ? Mr. Leonard Lispenard, a few years afterwards failed, and his bonds were consequently lost, and there would be nothing surprising or extraordinary if a like misfortune had befallen Mr. Stewart.

What person, possessed of common sense or ordinary intelligence, would ever have consented to have parted with an estate on such terms? And what person having a proper regard for his reputation and character, would ever have advised this woman to make such a disposition of her property ? The grantees prescribe their own conditions, employ their own lawyer, and Alice never appears to have been consulted in the whole transaction. But it is said that Mr. Charles Graham, the lawyer engaged, was a respectable man; he was, and it is due to his fame, to state that in this business, he acted only as their counsel, and not that of Alice Lispenard, whom he never saw in the whole affair.

There is one consideration more, which to my mind is conclusive; and I almost regret that I did not rest my decision on it alone, without going through this long and tedious examination.

In all wills where capacity is doubtful, proof of origin and of instructions is necessary, and evidence of mere

1841.

Stewart's Executor
*v.*
Lispenard.

1841.

Stewart's Executor
v.
Lispenard.

formal execution is insufficient. 1 *Phil. R.* 199, *Billing-hurst* v. *Vickars,* formerly *Leonard.* 2 *Addams R. Brogden* v. *Brown, p.* 441. No proof of this kind was offered by the party propounding the will, although his able and learned counsel must have been fully aware of its importance; and as it was in his power to have furnished this evidence, it is fair to conclude, that the instructions for drawing the will were given by the executor himself, the party benefited, in whose house she was residing, who held in his possession all her estate, controlled her in all her actions, exercised the power of imprisoning her, and could put her out to board in such places and on such terms as he thought proper.

In what light a will is regarded in law where it is obtained and procured by a person interested, may be seen by referring to 1 *Hagg. R. p.* 384, *Ingram* v. *Wyatt.*

Nor was the deficiency of the proof in this respect supplied, as it sometimes may be, by the facts that occurred at the execution of the will. On that occasion, Alice, as usual, appears to have been entirely passive. Dr. Neilson proposed, as it was all understood, that it should be executed without even the formality of reading; but here Mr. Stewart, *not* Alice, interposed, observing, " Doctor, let us do things rightly." Important words these, and how much more important to be governed by them. If things had been done rightly, Mr. Stewart would not have been present at the execution of the will; he would not himself have given the instructions to have it drawn; no will or conveyance perhaps would have ever been made; and her person and property would have been put under the charge and protection of the court of chancery. Doctor Neilson says she did not appear at the time to have been under restraint; if he means mere physical compulsion, this may be true; but this surely is a very imperfect and inadequate idea of the term. There are moral restraints, that in legal contemplation, as effectually deprive a person of the attribute of free agency as the exercise of bodily force and coercion. The hope of obtaining favor, and still more the

fear of incurring displeasure, often operate on weak minds with irresistible sway. I do not mean to be understood, or to insinuate that Alice was menaced into compliance, or in the event of refusal, she would have been abridged of her comforts, imprisoned in her room, or sent to board with strangers; but as it was natural in her situation, if she had any reflection, to apprehend some or all of these consequences, Mr. Stewart, from a sense of delicacy and propriety, independent of higher legal considerations, should not have permitted her to have made a will in which he himself was the sole object of favor. Besides the want of capacity, and the absence of all proof as well of origin as of instructions, there is reason to conclude, that Alice, in executing the present instrument was not *sui juris,* and did not exercise that spontaneity or freedom of volition which is essential and indispensable to give validity and effect to a testamentary writing.

1841.

Stewart's Executor
*v.*
Lispenard.

The signing of a will by making a mark, I am of opinion is a subscription within the meaning of the act.

I have now finished all that I have to say in this highly interesting and important cause. If, in the course of my remarks, any expressions or observations have escaped me that have excited disagreeable or painful feelings, I sincerely regret the circumstance, and do solemnly protest that they were unintentional; but in making this concession, I would consider myself unworthy of the place I occupy, if I permitted considerations of personal acquaintance and respect to restrain me from freely expressing the honest convictions of my mind. It is in the sanctuary of justice where the truth is to be spoken in plainness and simplicity; and it is there that the great obligations of life are best practically taught, and receive their happiest illustrations.

I commenced this investigation with great reluctance; I have pursued it under feelings of anxiety and despondency; and I now dismiss it with pleasure, thankful to Him who directs the issues of life, that whilst so many others

connected with these proceedings have been called away, I have been continued until I have brought this matter to its present conclusion.*

Nothing further remains but to pronounce my final decision, which is, that Alice Lispenard at every period of her life was intestable for want of understanding; that the instrument propounded as her last will and testament be rejected; and that the costs of these proceedings be paid by the party producing the same for probate.

By the CHANCELLOR. (After adverting to an *irregularity* in the proceedings, in the prosecution of the *appeal* in not notifying all parties interested, which was to be corrected by arrangement between the parties before the entry of the decree, the Chancellor proceeded as follows:)

" The case, upon the merits, presents a simple question of fact as to the testamentary capacity of Alice Lispenard, at the time of the execution of the instrument propounded as her will: in other words, whether she was of such sound mind and memory, as to be perfectly capable of making a testamentary disposition of her property with sense and judgment, in reference to the situation and amount of such property, and to the relative claims of different persons or connexions by blood, or marriage, as proper objects of her testamentary bounty. *Den* v. *Johnson*, 2 *South. Rep.* 454; *Marquis of Winchester's case*, 6 *Coke's Rep.* 23 a. It is not necessary that a person should be absolutely deprived of all memory and reason, to render him incompetent to make a will. The laws of all countries presume that children under a certain age have not sufficient mental strength to be capable of making a will with sense and judgment; and if the law itself had not prescribed a limit within which this mental incapacity was presumed to exist, no one could for a moment sup-

---

* In the course of the last twelve months, Mr. Alexander L. Stewart, Mr. Montgomery Livingston, Mr. Charles Graham, and Dr. Graves, have departed this life.

pose that a child of the age of six or eight years only, was competent to make a testamentary disposition of his property with sense and judgment.   It necessarily follows that a person who has arrived at the age when the law deems him competent, but who has in fact no greater degree of mental capacity than children of the age of six or eight years ordinarily possess, is equally incompetent to make a valid will.   And upon a very careful examination of all the testimony in this case, I am perfectly satisfied that children in general at the age of eight years, who have had the same care bestowed upon them  that Alice Lispenard had during the life of her parents, and particularly during the first twelve or fifteen years of her life, would be as competent to understand the nature and value of property, and to dispose of it by deed or will, as she was at the time she made her mark to the instrument propounded as her will in this case.

*1841.*

Stewart's Executor
*v.*
Lispenard.

The surrogate, in his decision, very properly remarks, that the mere opinions of witnesses as to mental capacity, unaccompanied by facts and circumstances to support such opinions, are entitled to very little weight in a case of this kind, especially if those opinions come from witnesses whose minds were likely to be biassed in favor of either party.   For such is the imperfection of human nature, that it will be generally found that the opinions of witnesses even the most upright and honest, are in accordance with their feelings in behalf of the one party or the other; while the facts testified to by them, frequently are such as would have produced an entirely different impression upon a mind wholly unbiassed.   It would be a useless waste of time to go over this volume of testimony, with a view of stating its different bearings upon the point in controversy, here in a written opinion.   I have carefully read it over, in connection with the extended comments thereon, in the printed opinion of the surrogate, and I concur with him in most of the views he has taken of the evidence. I think with him, that the fact that the father of Alice,

after she had arrived at the mature age of twenty-four, deliberately declared in his will, " that it had pleased the Almighty that she should have such imbecility of mind, as to render her incapable of managing and taking care of property," is a strong and controlling circumstance in this case.   This is not the opinion of a casual acquaintance, or of a biassed witness, who unconsciously reasons himself into an opinion which is in accordance with his feelings or his wishes; but it is an opinion deliberately formed by a parent in relation to the mental capacity of his child, which was directly in conflict with all the feelings and desires of a father's heart.   It was a conclusion too, which had been irresistibly forced upon him, after he had for years tried all the usual means of instruction, to call forth the exercise of mental capacity in his child, if she was capable of exercising any.   Subsequent facts also show conclusively that her heart-stricken father, judged rightly in supposing that she was mentally incapable of managing or taking care of property.   For never from the time of the penning of that declaration till her own death, about thirty years afterwards, did she ever attempt to exercise any control over even the small annuity which was left for her support, except in the single instance where she was induced to make her mark to instruments, the object of which was to convey her property to others without security, and without any adequate consideration.

I am fully satisfied, therefore, that the surrogate and the circuit judge were right in supposing that the decedant never had sufficient mental capacity, either to make a will, or to dispose of her property in any other way; and that the instrument propounded was not her will, but the will of her brother-in-law, under whose direction it was prepared to be signed by her.

The statute directs that in a case of this kind, if the decision of the surrogate is reversed upon a question of fact, the question of fact shall be tried by a jury upon an issue to be awarded for that purpose.   And if this had

been a case in which there was any real doubt as to the testamentary capacity of the testatrix, it might have been proper to have reversèd the decision, for the purpose of having the question of fact settled by the verdict of a jury. But as it appears to me to be a clear case of mental incapacity existing from childhood, it would be improper to subject the respondents to the great expense of an issue, when it is not probable that any new fact will be elicited on the trial. Besides, the decedant had already disposed of all her interest in her brother's property, which is the principal subject of controversy here, by the two deeds which she was induced to execute a few days after his death; and the respondents will necessarily have to litigate the same question substantially, as to her mental capacity to execute those deeds before they can reach their interest in the property as her heirs and next of kin.

The decision appealed from must therefore be affirmed with costs to such of the respondents as shall have answered the petition of appeal, and the proceedings are to be remitted to the surrogate of New-York, with directions to grant letters of administration on the estate of the decedant, as in the case of intestacy.

The case was argued in this court by

*C. W. Sandford* and *Willis Hall*, (Attorney-General,) for the appellant.

*B. F. Butler* for the respondents.

*Points presented and argued on the part of the appellants:*

I. The testatrix, Alice Lispenard, at the time of making her will, was of sound disposing mind and memory, and capable of making a legal disposition of her property by will. Sanity and capacity are to be presumed, until the contrary is shown. *Swinburn on Wills,* 78. 3 *Haggard Eccles. Rep.* 598. 3 *Starkies' Evid.* 1702. 12 *Vesey's R.* 445, 450.

*1841.*

Stewart's Executor
*v.*
Lispenard.

1841.

Stewart's Executor
v.
Lispenard.

II. The law does not measure the size of peoples' understandings or capacities. If a man is legally *compos mentis*, he is the disposer of his own property, and his will stands as a reason for his actions. There is no such thing as an equitable incapacity, where there is a legal capacity. 1 *Swinburn on Wills*, 127, *note*. *Osmond* v. *Fitzroy*, 3 *P. Williams* 129. *Townsend* v. *Lowfield*, 1 *Vesey* 36, 37. *Jackson* v. *King*, 4 *Cowen* 216. *Matter of Morgan*, 7 *Paige* 236. *Odell* v. *Buck*, 21 *Wendell* 142.

III. The will in question was made by the testatrix, pursuant to her repeated declarations, in favor of those relatives who had shown her the most uniform attention and kindness.

*Points submitted and argued on the part of the respondents:*

I. Alice Lispenard, the testatrix, did not possess a sound and disposing mind and memory, so as to enable her to make a legal disposition of her property by will; but, from her nativity, was a person of *unsound mind* within the meaning of the statutes of this state. 1 *R. S.* 719, § 10. 2 *R. S.* 52, § 1; 56, § 1; 60, § 21. *Marquis of Winchester's case*, 6 *Coke's R.* 23. *Den* v. *Johnson*, 2 *Southard's R.* 454. *Countess of Portsmouth* v. *Earl of Portsmouth*, 1 *Haggard's Ecclesiastical Reports*, 355. *Ingram* v. *Wyatt*, *ib.* 400 *to* 404.

II. If the testatrix was not absolutely intestable, yet under the circumstances of this case, the paper propounded as her will was palpably invalid. 1. The testatrix was a person of very weak understanding, wholly ignorant of the nature and value of her property, and in a state of *pupilage* to her brother-in-law and niece, the devisees and legatees of her estate, who stood to her, in the relation of guardians, and each of whom had a great ascendancy over her. The obtaining of a will, exclusively for their own benefit, from a person thus situated, was an unreasonable and improper use of their power over her, and one which

the law will not suffer to be carried into effect. *Gibson* v. *Jeyes*, 6 *Vesey*, 278. *Huguenin* v. *Basely*, 14 *Ves.* 273. *Billinghurst* v. *Vickers*, 1 *Phillimore's R.* 187. 193, 200. *Paske* v. *Ollatt*, 2 *Phillimore's R.* 323. *Ingram* v. *Wyatt*, 1 *Haggard's Eccl. R.* 390, 400, 355. 2. It should, at all events, have been shown, that the testatrix voluntarily gave instructions for the will, and that it was prepared at her request. There is not only an entire absence of any such proof, but the manner in which the instrument was executed, taken in connection with the other facts in the case, justifies the presumption, that it was prepared by the brother-in-law and niece, of their own accord, and without any such instructions or request. This consideration greatly strengthens the objections above stated, and is, of itself, decisive against the validity of the paper as a will. *Cases above cited. Middleton* v. *Forbes*, stated 1 *Haggard's Eccl. R.* 395, 400. *Dodge* v. *Meech*, *ib.* 619, 620.

The argument of this case was commenced on the *twenty-first* day of *December*, 1841, and occupied three days. On the thirty-first the case came up for decision.

The PRESIDENT of the Senate asking whether any member of the court was prepared to read a written or deliver an oral opinion,

Mr. *Justice* BRONSON, (the only justice of the supreme court present at the argument of the cause,) said that he had no written opinion to present, not having had leisure since the argument was closed to digest the facts of the case, or even to read the numerous authorities which had been cited, amounting to nearly or quite one hundred cases, and that, therefore, he should decline to deliver an opinion. He had come into court solely for the purpose of enabling the court to form a quorum.

*Senator* LIVINGSTON thereupon proceeded and read an opinion, assigning reasons for a reversal of the decree of

*1841.*

Stewart's Executor
*v.*
Lispenard.

1841.

Stewart's Executor
v.
Lispenard.

the Chancellor. (The reporter has not been furnished with a copy of this opinion.)

*Senator* VERPLANCK orally delivered an opinion, also for a reversal. The reporter has since been furnished with the following opinion, written out by the learned Senator:

By *Senator* VERPLANCK. My first impression, on the opening of this cause, was strongly in favor of affirmance. The decision below came up to us with a great weight of authority in the apparent concurrence of the three courts through which the cause had passed; and though this was lessened by the admission, that the affirmance by the circuit judge had been merely *pro forma* by agreement of parties, for the purpose of bringing up the appeal to this court, still, the very decided opinion of the learned, able and experienced surrogate (Campbell) corroborated by that of the Chancellor, led my mind to a view of the case, which I did not suppose it possible that argument or farther examination could change. The argument of the appellant's counsel brought me gradually to doubt, and finally to rest in an entirely opposite conclusion, founded, I think, in clearer and more definite views of the law of the case than had governed my first impressions. The conclusion thus formed on the argument has been confirmed by as careful an examination of the decisions in the books and of the voluminous evidence of this case as it has been in my power to bestow since the close of the argument. I am accordingly of opinion that the several orders or decrees appealed from in this case are erroneous, and that the will of Alice Lispenard should be admitted to probate.

Both the law and the facts of the case are submitted to our judgment. Let us consider the first separately.

In an opinion just read, but prepared some months before the hearing of this cause, in the case of *Remsen* v. *Brinckerhoff*, (*post p.* —,) I took occasion to assert the principle, that the right of testamentary bequest was not, as some great jurists maintain, a mere institution of positive law, but a

natural right, subject to the restrictions and regulations of civil legislation, yet not its mere creature. The reasons there stated have a more direct application to the present case than they had to that in which they were advanced, as there they were intended simply as a protestation against an unsound argument. Here they are connected with the principle of the decision, for that in my judgment, though it rests also on other reasons, yet receives much support from those considerations, as they show that the primary legal presumption of law and of evidence must be always in favor of the right of bequest, and of the legal capacity to exercise it, while the restrictions or exceptions are to be taken more strictly.

1841.

Stewart's Executor
v.
Lispenard.

By our statute, 2 *R. S.* 4, the former acts of England and of this state are thus re-enacted: " Every male person of the age of eighteen, and every female (not being a married woman) of the age of sixteen and upwards, of sound mind and memory, and no others, may give and bequeath his or her personal estate by will or testament." The corresponding clause in relation to real estate, 2 *R. S.* 56, enacts that " all persons except idiots, persons of unsound mind, married women and infants, may devise their real estate by their last will and testament duly executed." The language of both these sections corresponds with that of the statute regulating conveyances, and must be governed by the same decisions, and interpreted and applied in the same spirit. " Every person capable of holding real estate, except idiots, persons of unsound mind, and infants, seized of or entitled to any estate or interest in lands, may alien such estate at his or her pleasure, with the effect and subject to the regulations prescribed by law." 2 *R. S.* 719, § 10. In respect, therefore, to the validity of any devise or bequest, just as in regard to that of any conveyance, whilst the prudent and necessary exceptions of the statute must be respected and obeyed; yet it is always to be borne in mind, that these are only exceptions to a more general rule and to a common right, and must, therefore,

never be carried beyond the strict meaning and obvious policy and intent of the law. Theoretical and abstract as the principle may appear, yet the conclusion to which it leads, will be found to coincide with the rules and decisions of the best authorities, and especially with those cases in our own courts, which have held, as in *Jackson* v. *King*, 4 *Cowen*, 207, that when any act otherwise valid has been sought to be avoided because of mental incapacity, the proof lies upon him who alleges that defect, whilst sanity and capacity are to be presumed until inability is shown; that (as it is expressed by Judge Woodworth) " the disability of contracting applies exclusively to idiots and lunatics, or persons *non compos;*" that mere weakness of understanding is not enough, but defect of reason must be made to appear, that the *imbecil*, therefore, does not labor under the general disability of the idiot or insane, although some particular act may be set aside by reason of other facts or circumstances connected with his imbecility.

Let us, then, leaving the consideration of these primary principles, examine how the law of the case stands upon the authority of decisions and the legal interpretation of our statutory language.

Our statute law expressly declares, as we have seen, the right to dispose of property by will, (as of real estate by deed,) to belong to all persons of sound mind and memory, other than those excepted on the ground of infancy or of coverture. The other exception, expressed negatively in the provision as to bequests of personal property, and directly in the corresponding clauses as to other dispositions of real estate by deed or will, is of " idiots or persons of unsound mind." What then, is the precise legal intent of these words ? They are not words of ordinary colloquial language, but they and their converse phrase, " persons of sound mind," are drawn from the vocabulary of the law, where they have long been of familiar use, as well in the common law courts as in those having testamentary jurisdiction. Our revisers expressly inform us, in their

note on *Art.* 2, *chap.* vi, *pt.* 2, § 22, " Of wills of personal property and the probate of them," that " in drawing the above section, (§ 21, as it now stands,) an effort has been made to condense the common law as it seems to be understood by Justice Blackstone." The passage of Blackstone referred to, (2 *Black. Comm.* 496,) after stating the civil disability of infants below certain ages, to make a valid testament, adds, " Madmen, or otherwise *non compotes*, idiots, or natural fools, persons grown childish by reason of old age or distemper, such as have their senses besotted with drunkenness—all these are incapable, by reason of mental disability, to make any will as long as such disability lasts." To the same effect is the older authority of Lord Coke, from whom the definitions or descriptions of the modern commentators are drawn. " Unsound mind and memory," in the sense and use of the law, can mean only such defect of mind and memory as the law notices for some legal purpose, as of disability, of protection, or of exemption. But according to Coke, (1 *Inst.* 246,) whose authority to this point is recognized by Blackstone, (1 *Comm.* 303,) " *non compos mentis* is the most legal term for all defects of the mind which the law notices. *Non compos mentis* is of four kinds: 1. *Idiota*, which from his nativity by a perpetual infirmity is *non compos mentis*. 2. He that by sickness, grief, or other accident, wholly loses his memory and understanding. 3. A lunatic, that hath sometimes his understanding and sometimes not, and therefore he is called *non compos mentis* so long as he hath not understanding. 4. Lastly, he that for a time depriveth himself, by his own vicious act, of his memory and understanding, as he that is drunken." The accurate *Comyns* thus sums up the several ancient authorities of Coke, Fitz Herbert, Staundford, &c., " Persons who are *non compos mentis* are idiots or of non sane memory." *Comyns Dig. Tit. Idiot,* (*A.*) Thus we find, that from Fitzherbert to Blackstone, the phrase *non compos mentis* is used by the greatest authorities of the common law, as synonymous

**1841.**

Stewart's Executor
*v.*
Lispenard.

with that " of non sane mind and memory," the " unsound mind " of modern phraseology and our own statute books. But the same line of unvarying authorities shows, that in legal intent, the natural defect of mind thus absolutely shutting out persons from the ordinary rights of society, does not consist in a limited degree of intelligence, but in the entire absence of what, in the philosophy of elder times, was termed " discourse of reason." The idiot was one, according to Fitzherbert, " who has not any use of reason, . has no understanding to tell his age, who is his father or mother, what shall be for his profit and loss." *F. N. B.* 233. *Comyns Dig., Tit. Idiot.* And the same old and rigid rule is repeated two centuries afterwards by Blackstone: " A man is not an idiot if he hath *any glimmering of reason,* so that he can tell his parents, his age, or the like common matters." 1 *Black. Comm.* 304. In the same understanding of language, Lord Hardwicke, in *Ex parte Barnsley,* 3 *Atk. R.* 167, says " *Non compos mentis,* or, since the proceedings have been in English, of *unsound mind,* (which means the same thing,) are legal terms of a determinate signification, understood by courts of law, importing not weakness of understanding, but a total deprivation of reason." I cite this as sound and strong authority because, although the later decisions of Lord Chancellor Eldon, in England, 6 *Ves.* 273, *and* 8 *Ves.* 65, and of Chancellor Kent with us, *Barker's case,* 2 *Johns. Ch. R.* 233, have so far overruled the decision in *Barnsley's case* as to extend the protection of chancery to persons worn out with age or disease, and become incapable of managing valuable estates and large concerns, yet this does not impeach the accuracy of Lord Hardwicke's definition. The decisions of Chancellors Eldon and Kent go either to extend the jurisdiction of chancery over lunatics, to those in second childhood and mere dotage, falling under the second class of Lord Coke, (see per Kent, Chancellor, in *Barker's case,*) or else, in congruity with another principle of the common law, (which I shall presently notice,) applied

the preventive and paternal care of the court to guard against fraud or waste arising from mental incapacity, relatively inadequate to the management of large property, whilst the party might yet, in the eye of the law, be under other circumstances, competent to the common rights and duties of life. But it is the unvarying doctrine of the English books, that the "man of mean understanding, yea, though he incline to the foolish sort, is not prohibited to make a testament." *Swinburne* 127–8. This ancient rule is thus expressed and reiterated by the latest and best text writer on this subject, *Shelford on Lunacy, p.* 37: "A person being of weak understanding, so he be neither an idiot nor a lunatic, is no objection in law to his disposing of his estate. Courts will not measure the extent of people's understanding or capacities; if a man therefore, be legally *compos mentis*, be he wise or unwise, he is the disposer of his own property and his will stands as a reason for his actions." The rules and definitions of our own judges, and the decisions of our own courts, are in conformity with those authorities. Thus we find Judge Woodworth repeating and adopting the definition of Lord Hardwicke: "The term *non compos*, of unsound mind, are legal terms, and import a total deprivation of sense." Per Woodworth, J., in *Jackson* v. *King*, 4 *Cowen* 217, citing 2 *Madd. R.* 569, and this dictum is cited and approved by Judge Cowen in his valuable and useful work on the "Jurisdiction of Justices of the Peace." 2 *Cowen's Treatise*, 707. The case just cited, Judge Cowen observes, "has never been overruled or questioned in our courts," and "must be considered as the law of the land, and entitled to the consideration of undoubted authority." 2 *Cowen's Treatise* 706. It has accordingly been followed and applied recently, in 21 *Wendell* 142, and 24 *Id.* 85. It holds, that absolute disability to contract, on account of mental infirmity, is confined to idiots and lunatics, or persons *non compos*, in the sense of Judge Woodworth's definition; that mere weakness of understanding is not enough—an entire

1841.

Stewart's Executor
*v.*
Lispenard.

1841.

Stewart's Executor
v.
Lispenard.

defect of reason must be shown. In the cases in 21*st and* 24*th Wend.*, the " person of imbecile mind " was still held to have reason and understanding, and not to be a lunatic, a fool, or an idiot," in the sense of the law, as respects legal capacity or incapacity. See also, the opinions of Justice Washington in the United States circuit court, 3 *Wash. R.* 587; 4 *Id.* 261.

Ought not this to be so, upon reason and principle ? Is the rule which has come down to us through so many confirming authorities, contrary to right reason or to public policy ? Must not the general rule be such as the decisions and opinions just cited have declared it, upon the reason of the thing itself, independently of all positive law? The substantial and obvious reason of the invalidity of the wills of persons of unsound mind, as well as of their other contracts and legal engagements, is their inability to consent, with knowledge, to the act or bequest. This is clearly stated, with all the lucid succinctness and generality of a legal aphorism, by Sir John Nichol: " Want of reason must of course invalidate a contract, the very essence of which is *consent.* It is not material whether the *want of consent* arises from idiocy or lunacy." 2 *Phill. R.* 70. Now the imbecile and feeble mind has the power of consent to matters within its comprehension, and may commonly comprehend the general disposition of property, relying upon the advice and aid of those friends upon whom experience has taught it to rely safely for the prudence of details and the legal effect of the transaction, just as the unlettered or the infirm must do in many of the transactions of life, whatever may be their mental acuteness and activity. In some particular transaction its facts and nature may make it clear that the matter was not comprehended by a dull and ignorant mind, and that therefore his consent was wanting; nevertheless such want of consent cannot be presumed of course, as a presumption of evidence as to any one who has the humblest use of reason. Again—taking mankind such as observation shows us hu-

man nature to be, can any other than this be a safe, pru-
dent, just, or politic rule? When we observe the strange
incongruities of human character—the astounding mixture
of sagacity and weakness in the same mind—"the fears of
the brave and follies of the wise"—when literary biogra-
phy shews us the discoverers of truth and the teachers of
wisdom, like Newton and Pascal suffering under "the va-
riable weather of the mind, the flying vapors of incipient
lunacy"—when, in ordinary life, it often happens that the
most sagacious and prudent in many of the affairs of busi-
ness, are yet in some point of domestic conduct, or some
one matter of opinion or action, guilty of absurdities such
as the feeblest minds could not commit, one might almost
adopt the startling conclusion of Dr. Haslam, who, after
years of professional observation of the phenomena of men-
tal disease, when examined in the remarkable case of Miss
Bagster, in answer to the customary question, "Was Miss B.
of sound mind?" replied: "I never knew any human being
who was of sound mind." So again: if we look around our
own circle of acquaintance, every one must have known
aged, blind, or infirm persons, unfitted by the state of their
minds, or of their senses, for the management of any af-
fairs, and from their necessary seclusion from the concerns
of life, entertaining false notions and mixing up the past
with the present. Yet these, and such as these, may by the
aid of their friends and families, upon whom they have a right
to rely, and with a general understanding of their own intent
and the effect of their acts, make wills, conveyances and
other dispositions of property, which could not be set aside
without gross and manifest hardship and injustice. To
establish any standard of intellect or information beyond
the possession of reason in its lowest degree, as in itself
*essential* to legal capacity, would create endless uncertainty,
difficulty and litigation, would shake the security of pro-
perty, and wrest from the aged and infirm that authority
over their earnings or savings which is often their best se-
curity against injury and neglect. If you throw aside the

1841.

Stewart's Ex-
ecutor
v.
Lispenard.

old common law test of capacity, then proofs of wild speculations or extravagant and peculiar opinions, or of the forgetfulness or the prejudices of old age, might be sufficient to shake the fairest conveyance, or impeach the most equitable will. · The law, therefore, in fixing the standard of positive legal competency, has taken a low standard of capacity; but it is a clear and definite one, and therefore wise and safe. It holds, (in the language of the latest English commentator,) that "weak minds differ from strong ones only in the extent and power of their faculties; but unless they betray a total loss of understanding, or idiocy, or delusion, they cannot properly be considered unsound." *Shelford on Lunacy, p.* 39.

But although the weak in intellect, the dull, the stupid, the decayed in mind, do not and ought not, upon any ground of policy, or right or authority, to labor under the personal disability of disposing of their property, which the law prescribes as to " persons of unsound mind," yet the books abound in cases where the courts, even at common law, have made void the bequests, devises and conveyances of the imbecile. Are such cases contradictory to the conclusions just stated ? I think, clearly not. They are founded on a different but closely allied principle, perfectly reconcilable with the other, and they are both applicable to cases like the present. By the decisions referred to, wills, deeds and contracts have been held void, when made by imbecile persons; but they were so held not on account of the general and positive disability of the party for the performance of *all* similar acts, but because of ·the relative character of the will or contract itself, and of all the external circumstances in proof, to the mental capacity of the party. They have been held void, not because the person making them was incapable of a valid consent to *any* act or contract, but because the whole transaction taken together, with all its facts, of which the proof of mental weakness was one, showed that the consent, " the very essence of the act," (per *Sir J. Nichol, 2 Phill. R.*

70,) was wanting to *that particular act.* Thus, whilst proof of stupidity, gross ignorance, folly or strange particular aberration of opinion, in a mind otherwise unclouded, is alone incompetent to affect the legality of an act of such a person; yet that evidence, when taken in connection with the disposition of the property, the interests and relative situation of those affected by it, and other circumstances may show conclusively, that this particular act of a person laboring under no general disability, wanted his consenting will and understanding; that the sound and disposing mind was deficient in regard to this special matter; that the whole was the result of fraud, of abuse of confidence, perhaps of delusion.

If this distinction were new in our legal system, its policy and propriety are so manifest, and its analogy to the general doctrine of our law on the effect of fraud or error upon contracts so close, that there could be little hesitation now to receive and establish it; but it may be found, either directly expressed or impliedly admitted, as the ground of decision in many adjudicated cases. Thus, in the luminous and elaborate judgment of Sir John Nichol, in *Dew* v. *Clark*, 3 *Addams R.* 79, where a will was pronounced void on the score of a very peculiar morbid delusion, the learned judge stated the question at issue to be, " not whether insanity in certain *other* particulars should have the effect of defeating *a will generally* of the deceased, or even this identical will, but whether his insanity on the subject of his daughter should have the effect of defeating not so much *any* will, as this identical will." So again in *Ingraham* v. *Wyatt*, 1 *Hagg.* 381, the will on its face, as well as all the external circumstances, indicated fraud; and as to the testator's capacity, the judge states, " the result of the evidence was, that he was a very weak man; that his understanding was very much below the legal standard of perfect capacity; the inertness, inactivity, torpidity of mind, inattention to his large property, were the leading characteristics and symptoms of his weakness;"

1841.

Stewart's Executor
*v.*
Lispenard.

**1841.**

Stewart's Executor
*v.*
Lispenard.

yet it is expressly added, " that he *might* possess a testable capacity; but that he was a person so far liable to be imposed upon as to require the court to look with vigilance into the proofs of the *factum*." The common law courts recognize the same distinction. The reasoning of Lord Chief Justice Tenterden in *Bell* v. *Martin,* 1 *Dow. Parl. R.* 386, goes to this result; and we find it repeatedly laid down in American reports, as by Judge Washington, 3 *Wash. R.* 587, " that a man's capacity may be perfect to dispose of his property by will, and yet very inadequate to the management of other business, as for instance to make contracts for the purchase and sale of property."

The decisions of our own supreme court, 4 *Cowen,* 207, already cited, involve and confirm the same view of the law. It affords no slight confirmation of the wisdom and justice of this rule, that it agrees with the decision of the French tribunals under the *Code,* as appears from the case *Beauquaire,* whose will was established on the ground that its provisions were rational, and the testator capable of comprehending them, though he was incapable of making contracts, &c. by reason of imbecility. *Sirey Rec. des lois et des arrets, Tom.* 8, *p.* 315.

If we then sum up the whole doctrine of the law of wills as affected by mental incapacity, we shall find it just, reasonable and consistent with itself, as well as in perfect harmony with the decisions and rules touching the effect of unsoundness or weakness of understanding in avoiding deeds and contracts.

The right of testamentary disposition is regarded as a common and natural right, to be restricted no farther than public policy and the necessary evidence of intent and consent absolutely require. When the testator is shown to possess such a rational capacity as the great majority of men possess, that is sufficient to establish his will. " When this can be truly predicated, bare execution is sufficient;" (per Sir J. Nichol, 1 *Hagg. R.* 385;) no matter how arbitrary its provisions, or how hard and unequal may be its

operation on his family. On the other hand, when a total deprivation of reason is shown, whether from birth, as in idiocy, or from the entire subsequent overthrow of the understanding, whether permanently, or existing only at the time of execution, further inquiry is needless, the will is itself a nullity, however just and prudent in its provisions, and with whatever fairness of intention it may have been obtained by well-meaning friends. That intermediate class, who fall below the most ordinary standard of sound and healthy minds, whether from the partial disease of one faculty, or the general dulness and torpor of the understanding, are not òn that account interdicted from the common rights of citizens, and least of all from that of testamentary disposal. But their defect of intellect may furnish most essential and powerful evidence, in union with other proof, that some particular will or codicil was obtained by fraud and delusion; that it had not the consent of the will and understanding, and was not executed by one, who, in *that respect*, was of a sound and disposing mind and memory. As in the former class of cases, there is a general legal disability, because the party from total unsoundness of mind and memory is unable to consent with understanding to any legal act whatever; so in the latter instances, there may be shown an absence of consent to the particular will from inability to comprehend its effect and nature.

Let us now examine how the evidence before us applies to this view of the law, which naturally directs us to two points of enquiry: 1st. Was the decedant mentally incompetent to make *any* valid testament whatever ?—or, in other words, was she of unsound mind and memory in the strict sense of the law; and 2d. If not so, is there yet evidence sufficient to invalidate this *particular* will, by reason of the imbecility of the party taken in connection with the dispositions of the will, the situation of the parties, and all the circumstances of the *factum* ? [Here *Senator* VER-

1841.

Stewart's Executor
*v.*
Lispenard.

PLANCK adverted to the evidence in the case at some length, and then proceeded as follows:]

With regard to the first point of enquiry: We find that the numerous, respectable and intelligent witnesses in support of the will, represent the testatrix as a person of very dull and feeble mind from infancy, as laboring under physical and external disadvantages, being from childhood very near sighted; unwieldy in person and ungainly in manner; of neglected education, having been early suffered to indulge in the free and indeed immoderate use of liquors; that in consequence of all this, she impressed those who saw her transiently with the belief of her being a perfect idiot, yet upon fuller knowledge showing herself, though dull and ignorant, possessed of reason and understanding far above idiocy; having a general notion of property, and knowledge of her possessing some, with the right to dispose of it:—finally, as exercising some of the higher moral faculties in overcoming (with the aid of friendly care and remonstrance,) her habits of intemperance, and in her last days understanding and expressing the hopes and consolations of religion. On the other hand, is a large array of witnesses, many of them highly respectable and intelligent, who concur in representing her, not only as silly and stupid but as utterly incompetent to the understanding of any right, or the care of herself in any particular. Much of this apparent conflict of evidence may, (as is common in such cases,) be resolved into differences, not as to facts, but of opinions or conclusions formed according to the varying circumstances of observation. If, however, we regard the evidence as in direct collision, we shall find the testimony of those who represent *Alice Lispenard* as having been merely a dull and imbecile, but not an idiotic person, as much outweighing those who depose to the lowest grade of intellect: 1st. In number. 2d. In the means of information or observation, as members or inmates of the family, physicians, &c. 3d. In station, education, and intelligence—I mean, taken together, without denying the

respect due on this last score to several witnesses in oppo-
sition to the will.   Among the former are the subscribing
witnesses, who are constituted by statute the first and ne-
cessary evidence, both of whom attest positively to her
capacity to make a will.   They were both of them experi-
enced and respectable physicians; one of them, Dr. Neil-
son, long conversant, as appears from our own legislative
documents, with the observation of mental infirmity, as a
physician of the Bloomingdale Asylum; the other a physi-
cian of the family, who had " known Alice for ten or fif-
teen years; had seen her frequently during that time, al-
most every day; had opportunities of judging of her capa-
city, from having paid particular attention to her as an
observer for six or eight years past."   With these gentle-
men agree other medical witnesses.   " Mere opinions," says
Judge Washington, " of witnesses as to mental capacity
are entitled to little or no regard, unless supported by good
reasons, founded on facts which warrant them.   To this,
as a general rule, the opinions of medical men may be con-
sidered as an exception."   3 *Wash. C. C. R.* 587.   These
opinions are supported by the testimony of respectable
clergymen, intimate or resident in the family; by members
of the family; by the late Charles Graham, an eminent
lawyer and family friend; by Mr. Davison, a wealthy
neighbor, with many others.   Now all this evidence is so
direct and positive, so *affirmative* in its character, that al-
lowing for all the exaggeration, which the wishes and
inclinations of some, and the possible interests of others
might give to testimony, still it seems susceptible of being
accounted for, only upon the supposition of its substantial
accuracy, or else of an extended and complicated conspira-
cy, comprehending many persons wholly beyond suspicion
and utterly without any reasonable motive to lend them-
selves to a fraud or perjury.   This evidence, compared
with much of the opposing testimony, has the superiority
of affirmative testimony, asserting the possesion of a certain
degree of intelligence by Alice Lispenard, over that of a

1841.

Stewart's Ex-
ecutor
*v.*
Lispenard.

mere negative character as to want of intelligence in many particulars. It is not merely the language and opinions of witnesses that I refer to. A few affirmative facts showing understanding, however humble, must, in such an enquiry, directed to the point of idiocy or total want of reason, not of lunacy or disturbed and clouded intellect, outweigh very many negative facts. The affirmative facts prove the existence of mind; and when that is once shown, the negative go to shew only its defects and weakness, not its entire deprivation. According to the old rule, " a wise man does not always shew reason; a fool never does." The admitted weakness of Alice will go far to reconcile and explain the whole body of testimony, for that is perfectly reconcileable with an apparent idiocy. But we cannot, in my judgment, deny the degree of intellect claimed for her by the subscribing medical witnesses, by Mrs. Stewart, and Messrs. Graham, Edwards and others, without total disbelief in their testimony. Taking the whole body of evidence together, it may all stand unimpeached, and the question thus resolves itself into one rather of law than of fact; whether the state of mind, shewn by the whole testimony, was such as to render the decedant incompetent to make any valid will whatever.

The surrogate and the Chancellor have laid great stress upon a clause in the will of Alice Lispenard's father, which they concur in regarding as " a strong and controlling circumstance in the case." The clause is this: " And as it has pleased Almighty God that my daughter Alice should have such imbecility of mind as to render her incapable of managing or taking care of property, my will further is, that she be allowed for her maintenance the sum of five hundred dollars annually during her natural life; and that my executors *pay* out of the income of my estate *to my said daughter Alice* the said sum of five hundred dollars in half yearly payments, to commence immediately after my decease," &c. The Chancellor and surrogate have cited and relied upon only the first part of the

sentence, without noticing the subsequent direction. Tak- 1841.
ing the whole together, it appears to me that the father's
judgment of his daughter's infirmity is in perfect accord- Stewart's Ex-
ance with the estimate of Alice's understanding to be de- ecutor
duced from the evidence in support of the will. He con- Lispenard.
sidered her " incapable of managing and taking care of
property," and therefore, instead of leaving any considera-
ble capital under her control, he charges his estate with an
annuity of $500 for her maintenance; but he does not
place that annuity beyond her control; on the contrary, he
directs it to be paid over half yearly to herself, thus giving
her a discretion over a considerable expenditure, which
would never have been allowed to a mere idiot. Had she
been thus regarded by her father, the payment would have
been directed to be made to trustees for her support. That
she was incapable of managing property so as to be trusted
by a prudent father with any amount of capital is allowed
on all hands; but that inability did not render her legally
incapable of making a will. In the words of Judge Wash-
ington, " The capacity may be perfect to dispose of per-
perty by will, yet very inadequate for the management of
other business; as for instance, to make contracts for the
purchase and sale of property. 3 *Wash. C. C. R.* 587.
See also 4 *Id.* 262, and to the same effect are the authori-
ties of Lord Redesdale and others, cited by the attorney-
general, 9 *Vesey, R.* 610. *S. P. Wilson* v. *Wilson,* 2 *Dow.
Parl. R.* 283.

I cannot, therefore, resist the conclusion, that the whole
evidence establishes that degree of understanding, how-
ever low and sluggish, which raised the testatrix above
the absolute and general legal incapacity of the mere idiot.

But the low degree of understanding of Alice, as it is
admitted on all sides, (with the exception of one or two
witnesses, who indicate a higher opinion of her capacity,)
leaves the question still open, whether this will was valid
as executed with a disposing mind and intent, with suf-
ficient understanding of its effect, and without fraud or co-

ercion.  We have before us, first, the testimony of the two subscribing witnesses, disinterested and experienced physicians, who had long known her, and whose attention is positively shown to have been directed to the point of Alice's intelligence, that at the time of signing, which was whilst in her usual health, she declared, " that she wished the whole of her property given to her brother, Mr. Stewart," (which is substantially the whole will,) and that the witnesses had no doubt of her capacity.  There is, then, proof from other quarters of her general knowledge and understanding of her possession of property, and power of disposing of it; and moreover, proof of previous declarations of intent, " that her other relatives should not have a cent of her money; her brother, A. L. Stewart, should have it all;" which is in conformity with her will as executed.  Thus, besides the evidence of unimpeached subscribing witnesses, alone ordinarily held sufficient, we have the best collateral evidence of previous intention, unbiassed, save by the natural and legitimate affections of gratitude and attachment to those with whom she had long lived, and who had deserved it by long and persevering care and kindness.  There is precisely and amply ".the evidence of affection and testamentary declarations," which Sir J. Nichol speaks of as usual and proper, " where there is any doubt of capacity or suspicion of fraud."  1 *Hagg. Ec. R.* 431.  The proof of a general understanding of the nature and effect of her will " to leave all her property to A. L. Stewart," is all that the law requires.  According to the clear rule, repeatedly laid down by Judge Washington, " It is sufficient if the testator has such a mind and memory as enable him to understand the elements of which the will is composed; the disposition of his property in its simplest form."  3 *Wash. C. C. R.* 587.  4 *Id.* 264.  To require more than this would be generally to exclude females, ignorant persons, and persons laboring under violent and painful disease, from the power of testamentary disposition.

But in almost every case of disputed capacity, whe-
ther in relation to testamentary disposition or to con-
tracts and conveyances *inter vivos*, the act or will itself
has, in its nature and effect, been judicially regarded as an
essential and most important part of the evidence of capa-
city. See *per Justice Jebb*, of the Irish common pleas, and
Lord Chief Justice Tenterden in *Bell* v. *Martin*, 1 *Dows.
Parl. R.* 386. *Jackson* v. *King*, 4 *Cowen*, 207 ; and *Brog-
den* v. *Brown*, 2 *Addams' Eccl. R.* 441, 449. In this last
case, the following strong language is used by Sir J.
Nichol: "Such an alleged will, the court may readily
presume that the testator would acquiesce in and adopt, if
not wholly deprived of consciousness; and mere acquies-
cence and adoption in such a case would so compensate for
any want of direct evidence of instruction given *a priori*,
that proof of this alone, in conjunction with any whatever
*glimmering of capacity* at the time of execution, would be
good to support the will, and would sufficiently indicate
mind and volition to justify a court in pronouncing for it
as a genuine and valid will in my judgment." If the tes-
tamentary disposition be in itself consistent with the situa-
tion of the testator, and in congruity with his affections
and previous declarations; if it be such as might have been
naturally expected from one so situated, this is itself ra-
tional and legal evidence of no small weight to testamen-
tary capacity; whilst the reverse will alone furnish occa-
sion of doubt, demanding other evidence to refute it. The
rationality of the act goes to show the reason of the per-
son. This rule has been repeatedly applied in the Eng-
lish courts in cases of doubtful capacity from age or death-
bed disease, and the reason applies equally to doubt founded
upon connate imbecility. *Cook* v. *Gould & Bennett*, 1
*Hagg. R.* 577. *King* v. *Farley*, *Id.* 502. *Waters* v. *How-
let*, 3 *Hagg. R.* 790. *Bird* v. *Bird*, 2 *Hagg. R.* 142.
*Marsh* v. *Tyrrel*, 2 *Id.* 84. *Martin* v. *Wotton*, 1 *Lee Eccl.
R.* 130. *Bittleston* v. *Clark*, 2 *Id.* 229. I am indebt-
ed for reference to these last cases to the excellent work

**1841.**

Stewart's Executor
*v.*
Lispenard.

of our countryman, Dr. Ray, on the " Medical Jurisprudence of Insanity," a work of great learning and ability, to which I am also indebted for other more general views of the doctrine and philosophy of legal capacity and its evidence. *Ray's Juris. Insanity,* § 221. The same doctrine is recognized in the French decision in *Beauquaire's case,* reported by *Sirey,* on which also see Dr. Ray's remarks and summary, § 84. The will under consideration appears to be just such a one, as Alice Lispenard would naturally have made, in favor of those whom she had for years looked to with respect and gratitude; whose care had rescued her from neglect, raised her in moral character, and in some degree enlightened her understanding. Had the will been otherwise, had it bequeathed her property, contrary to her former declarations and natural preferences, without the knowledge or advice of those of her family with whom she resided, and to other relatives to their exclusion, this, to my mind, would alone, in one of her rate of intellect, have raised a presumption of fraud, or of want of proper disposing understanding, requiring other testimony to explain it and establish the will.

I shall vote for an unqualified reversal.

*Senator.* Scott, also delivered an oral opinion for reversal. The reporter has since been furnished with the following opinion, written out by the learned Senator:

By *Senator* Scott. Was Alice Lispenard at the time of making her will, capable of making a legal disposition of her property ? All persons except idiots, persons of unsound mind, married women and infants, may devise their real estate by last will and testament. 1 *R. S.* 56, § 1. The inquiry is confined to the exceptions in the statute: " Idiots, persons of unsound mind." Idiocy, sometimes called *fatuitas,* is usually a congenital disorder, consisting in a defect or sterility of the intellectual powers, not like lunacy or madness, which is a perversion of intellect.

1841.

Stewart's Executor
v.
Lispenard.

*Chit. Med. Jur.* 347. It is not difficult to perceive extreme cases of deviation from sound intellect, yet in the gradation from a wise man to a fool, we frequently find the light and shade so blended, that we look in vain for the line which divides one from the other. No one has discovered a mental gage, by which we can test the strength or weakness of the human mind. Some attempt has been made by legislative exposition, in the act of 11 *Geo.* 4, *and* 1 *W.* 4 *Ch.* 64, which declares the term lunatic shall extend to any idiot or person of unsound mind, or *incapable of managing his own affairs*. This statute occupies a broader but not a more certain ground than ours, and the question recurs upon the single fact, the *capacity* of the testatrix, and this fact should have been decided by a jury. If this cause is to be decided upon its merits, the court must occupy the place of the jury. We have been presented with an octavo volume of 317 pages, containing the testimony of some seventy witnesses, and that very contradictory. The testimony on the part of the respondents is principally of a negative character. The witnesses thought or believed the testatrix an idiot, because she did not converse; said little, and appeared stupid, and they formed their opinions from her *silence* and *manner*. It is in evidence that she was very near sighted, was in the habit of intemperance in the early part of her life, and was very awkward in her person. This will at once account for the neglect of her education; her apparent stupidity and vulgarity, the neglect of the family, and a disposition always to place her in the back ground. The example set by them would of course be followed by visitors and strangers. The testimony on the part of the appellant is affirmative; it does not rest, as on the part of the respondents, upon the testimony principally of domestics, many of whom were ignorant and prejudiced, and spoke of unimportant events, that happened thirty years ago; but upon the evidence of several intelligent medical witnesses, not casually acquainted with the testatrix, but who had known her and

were in habits of intercourse with her for the last ten or fifteen years, and some for twenty five years before the execution of her will, particularly fitted from opportunity and education to give a sound opinion; men of science, and of high moral worth in our community. They testified that the testatrix had a good deal of sagacity; that her memory was good and even extraordinary, and her *ideas well arranged*; that she possessed the ordinary qualities for observation and reflection, and reasoning powers of mind; and they state an important fact, viz. that she abandoned the use of all intoxicating drinks the latter part of her life, which explains her alteration of character. The capacity to arrange our thoughts is, perhaps, the strongest evidence of a sound mind; at all events it is proof against the existence of *dementia:* in which all writers on medical jurisprudence agree.

One of the most important rules to assist in the discovery of the truth in this case, is to compare the intelligence of the witnesses on both sides. All other things being equal, the want of capacity in the witness to judge, makes his opinions of little weight. In following up this rule, the preponderance is greatly in favor of the appellant. I cannot therefore concur with the Chancellor, in the face of the testimony of highly intelligent witnesses, that a child of eight years of age would be as competent to dispose of her property by will as the testatrix; nor can I concur in the opinion that the declaration in the will of her father, that the imbecility of her mind was such as to render her incapable of managing or taking care of her property, is a strong and controlling circumstance in the case. Its importance is weakened exceedingly, when by that very will he allows her five hundred dollars annually, and directs it to be paid to her half yearly, leaving this amount at her own disposal. Why this was done, if she was so imbecile as to be unable to manage or take care of her property, is as inconsistent as unaccountable! It would have been more in keeping with such a singular and *unnecessary* de-

claration, to have placed this annuity in the hands of trustees, to be expended at their discretion for her support. It is in the power of a parent to deprive his child of his estate; but, as he cannot transmit to his descendants his intellect, so he cannot deprive them by last will of that mind which God has given them.

It is well settled, that every person of the age of discretion, is presumed to be of sound mind and memory until the contrary is shown, and this rule holds as well in civil as in criminal cases. 1 *Hale. Hist. P. C.* 33. It is contended that this court cannot find the facts; that it belongs to a jury to do so. If this position is true, then the court cannot decide upon contradictory testimony. Without a judgment on the facts, the rule of presumption must obtain, that the testatrix had a sound mind, because the contrary cannot appear, except by the finding of facts by the court. I have no doubt upon the merits, that Alice Lispenard was capable of making a testamentary disposition of her property. I see nothing in the circumstance of her making Alexander L. Stewart her devisee, calculated to throw doubt upon her capacity; but on the contrary, it was perfectly natural that she should give all her property to her brother-in-law, whose family had always bestowed upon her their most affectionate attentions, exhibiting a great contrast with the neglect of other branches of the family. Gratitude, affection and resentment all conspired to deprive those of her property whom she disliked, and to give it to those whom she loved best.

*Senators* DICKINSON, NICHOLAS, HULL, HUNTER, and ROOT also delivered brief oral opinions. The PRESIDENT of the Senate remarked that he found himself in the same situation with Mr. *Justice* BRONSON; not having been able to form an opinion in this case satisfactory to himself, he should decline to vote upon the question of affirmance or reversal.

1841.

Stewart's Executor
*v.*
Lispenard.

Upon the question being put, *Shall this decree be reversed?* the members of the court divided as follows:

*In the affirmative:* Senators DICKINSON, FURMAN, HOPKINS, HUMPHREY, HUNT, H. A. LIVINGSTON, PECK, PLATT, ROOT, SCOTT, VERPLANCK, and WORKS—12.

*In the negative:* Senators CLARK, ELY, HULL, HUNTER, JOHNSON, and NICHOLAS—6.

Whereupon it was proposed to enter a decree reversing the decree of the Chancellor, and the previous decrees of the circuit judge and surrogate, and directing the will of Alice Lispenard to be admitted to probate.

Mr. *Justice* BRONSON objected to the entry of such decree, and insisted that instead of directing the will to be admitted to probate, a deeree should be made directing a feigned issue to be made up to try the questions arising upon the application to prove the will.

Upon the question of settling the form of the decree, the counsel for the appellant were heard: They insisted that this court had not the power, in a case like the present, to award a feigned issue. Where the decision of the surrogate upon an application to admit a will to probate is *reversed* by a circuit judge, upon an appeal to him, and the reversal is founded upon a *question of fact*, the judge is required by statute to direct a feigned issue to be made up to try the questions arising upon the application, 2 *R. S.* 10, § 57; but where the decision of the surrogate is *affirmed* or *reversed* upon a *question of law*, the judge has no such power; his only duty in such case is to remit the proceedings to the surrogate and certify the decision made by him. 2 *R. S.* 505, § 97. From the decision of the circuit judge an appeal lies to the Chancellor, and from his decision to this court, but neither chancery or this court can award a feigned issue in a case where the circuit judge would not have authority to make such award. All an appellate court can do is to render such judgment as the

court below ought to have given. The question here, is **1841.** not a *question of fact*; it is a *question of law*, viz: had Alice Lispenard sufficient *mind* and *understanding*, judging from the facts disclosed, to make a valid will ? Do the facts show that she was an *idiot* or *non compos* ? The witnesses present at the execution of the will testify fully to her capacity at that time, and beyond that there can be no inquiry,where the capacity of the decedant was not called in question by a course of legal proceedings during his or her life. But were it otherwise, and should it be admitted that the question in this case was a question of fact, and that in the exercise of a sound discretion this court may send the case to a jury, it is asked with great respect, why send this case to a jury after having been passed upon by a court consisting of so numerous a body as this court of dernier resort.

*Stewart's Executor v. Lispenard.*

After hearing counsel, forms of decrees were submitted by Mr. *Justice* BRONSON and by the counsel for the appellants.

*Senator* VERPLANCK remarked that the motion to send down the cause to trial before a jury upon a feigned issue, was made upon the ground that the reversal here is on a matter of fact and not of law, and that therefore such an order for a feigned issue must be directed in conformity with the provisions of 2 *R. S.* 10, § 57, respecting appeals from surrogates to the circuit judges: " If it shall appear to the circuit judge that the decision was erroneous, he may by order reverse such decree; and if such reversal be founded on a question of fact, shall direct a feigned issue to be made up, to try the question arising upon the application to prove such will." In regard to this motion he said he must first suggest to the consideration of the court whether it be correct that the judgment had been reversed " on a question of fact." The whole inquiry was a mixed question of law and of fact, and as often happens in such

**1841.**

Stewart's Executor
*v.*
Lispenard.

cases, it was not easy to draw the line so as to discriminate precisely what belonged to the one, and what to the other; especially as either might affect the judgment of so numerous a body as this court. Yet he was inclined to the opinion that the reversal was not founded upon the denial or disbelief of *any fact* assented to, or relied upon in the courts below. We agree in the fact, he said, of the imbecility of Alice Lispenard, but we differ as to the legal effect of that degree of weakness, upon the legal distinction between idiocy and imbecility. We have done what the supreme court did, in the cases 21 *Wendell* 142, *and* 24 *Id.* 85. We hold the conclusion below to be erroneous, because, in a mixed question of law and fact, the facts were applied to an erroneous view of the law. Still he said he rather suggested this for the consideration of the court, than relied upon it as necessary for the decision of this motion, since the law and the fact are here most clearly intertwined throughout, and he had the greatest reluctance to claim for the adjudication of law any question beyond its strict and recognized domain.

But there were other reasons, he said, which to him were quite conclusive why the court should not now send down this case for farther and expensive litigation and longer delay—a case which had already been pending for six years. We learn, he said, from the statements of counsel on both sides, as part of the facts of the case, that the appeal to the circuit judge was *pro forma* merely, for his affirmance by consent, that the cause might come up to this court for final adjudication. This court was the tribunal selected for decision of all the questions, by both parties, and the right or chance of resort to a jury was thus expressly waived on both sides. We sit here, he said, as it were, their chosen arbitrators, as well as judges of the land. Nor are we under any obligation by law, even should our reversal be on a question of fact, to direct a feigned issue as the circuit judge is bound to do. The powers conferred by statute on this court are much more extensive. On

any " order or decree brought by appeal from the court **1841.** of chancery," this court has " power to reverse, affirm or alter such order or decree, or to make such order Stewart's Executor or decree therein as justice shall require." 1 *R. S.* 166, *v.* Lispenard. § 27. Nothing can be broader than this language. There are unquestionably, ordinarily, advantages in arriving at truth, through the living present witness, which a jury may possess; but here, having the evidence before us, in the shape in which it has satisfied both parties that it should be judged, unless there are very great doubts indeed as to some point of fact, (of which he said he was not sensible,) he would be reluctant to think that the ends of justice would be promoted by the court declining a final decision under any circumstances. But at present, he said, the usual advantages of a jury trial would not be obtained, as since the examination was taken, nearly six years ago, before Surrogate Campbell, several of the most important witnesses in support of the will had died, viz: Dr. Graves, Mr. Davison, Mr. Charles Graham, and he thought others—a longer delay, at the age of many of the witnesses, will, according to the ordinary probabilities of life, increase that number, if it has not already done so. A jury would then decide, in great part, as we must do, upon written or printed documents. Constituted as this court is, he said, we are, except for the purpose of oral examination, as good a jury as the parties can well obtain. It therefore seems to me, he said, that under the peculiar circumstances of the case, " justice does not require " of us any decree other than the final judgment of reversal, and the order that the will propounded be admitted to probate.

Mr. *Justice* BRONSON observed, that if the case had not been duly passed upon by the circuit judge, the appeal should be dismissed as irregularly here. But assuming it to be regularly here, it is now insisted that this case presents questions of law, and that therefore a feigned issue

should not be ordered. It is said that the subscribing witnesses fully testify to the capacity of Alice Lispenard, from which it is sought to be inferred that the testimony of those witnesses is entitled to greater consideration than that of the other witnesses in the case. This was not so, he said except where general incapacity was established, and the object was to prove a *lucid interval* at the time of the execution of the instrument. It had also been urged, that the question whether the testatrix was an *idiot* or *non compos* could not be raised, except as to the state of her mind at the very time of the execution of the instrument, unless such question had been agitated during her life-time. He said he could not subscribe to this doctrine. The question presented by the appeal was as to the capacity of the testatrix; and upon that point, there was a conflict of testimony, raising of course a question of fact, and not a question of law. In *Odell* v. *Buck*, 21 *Wendell* 142, which had been referred to, the verdict was manifestly set aside as against evidence, as the new trial was granted on payment of costs. In relation to the power of this court, he observed that the court is authorized to render such judgment as ought to have been given by the court below; but it has no power over the surrogate, or over the circuit judge, beyond what is conferred by the statute. When on an appeal from the decision of the surrogate, the circuit judge reverses the decision, and the reversal is founded upon a question of fact, it is his duty to direct a feigned issue to be made up to try the question; and such should be the course of this court.

The decree as drawn up by Mr. Justice Bronson, and submitted by him for adoption, after the usual introductory matter, was in these words:

" It is ordered, adjudged and decreed, that the decree of the surrogate of the city and county of New-York in this matter, the decree of the circuit judge of the first circuit, affirming the decree of the surrogate, and the decree of the

Chancellor affirming the decree of the circuit judge, be and    1841.
the same are hereby reversed; and it is further ordered,
adjudged and decreed, that a feigned issue be made up to Stewart's Ex
ecutor
try the questions arising upon the application of Alexander     *v.*
Lispenard.
L. Stewart to the surrogate of the city and county of New-
York, to prove the instrument or paper writing propoun-
ded as and for the last will and testament of Alice Lispe-
nard deceased; and that the said issue be tried at a circuit
court to be held in and for the city and county of New-
York; and it is further ordered, adjudged and decreed, that
the proceedings be remitted to the court of chancery with
directions to make the proper order for carrying this de-
cree into effect."

And on the question being put, *Shall the decree be thus
entered ?* the members of the court divided as follows:

*In the affirmative:* Mr. *Justice* BRONSON, and *Senators*
CLARK, ELY, HULL, HUNTER, JOHNSON, NICHOLAS, and
SCOTT—8.

*In the negative: Senators* DICKINSON, FURMAN, HOP-
KINS, HUMPHREY, HUNT, H. A. LIVINGSTON, PECK, PLATT,
ROOT, VERPLANCK, and WORKS—11.

The decree as drawn up by the counsel for the appellant,
and submitted to the court, after the usual introductory
matter, was in these words:

" It is ordered, adjudged and decreed, that the decree
of the surrogate of New-York made in this cause, and of
the circuit judge and chancellor affirming the same, be and
the same are hereby reversed; and it is further ordered,
adjudged and decreed, that the will propounded before the
surrogate in this cause, is the will of the testatrix, Alice
Lispenard; and that at the time of making the same, the
said Alice Lispenard was of sound mind and memory, and
capable of disposing of her property by will; and it is
further ordered, that the same be admitted to probate, and
that the proceedings be remitted, &c."

**1841.**

Stewart's Ex-
ecutor
*v.*
Lispenard.

And on the question being put, *Shall the decree be thus entered?* the members of the court divided as follows:

*In the affirmative:* Senators DICKINSON, FURMAN, HOP-KINS, HUMPHREY, HUNT, H. A. LIVINGSTON, PECK, PLATT, ROOT, SCOTT, VERPLANCK, and WORKS—12.

*In the negative:* Senators CLARK, HULL, HUNTER, JOHNSON, and NICHOLAS—5.

Whereupon the decree as drawn up by the counsel for the appellant, was accordingly entered.