---
Pilling *v.* Pilling.
---

---

FRANK PILLING, by Henry N. Hewitt, his next friend and special guardian, *appellant, vs.* SARAH PILLING and others, *respondents.*

Evidence held sufficient to establish the fact that a testator, at the time of the publication of an instrument offered for probate as his last will and testament, was of sound and disposing mind and memory and was competent to make and execute a will.

On appeal to the Supreme Court from a decree of a surrogate denying probate of an instrument propounded as a will, the court, if it deems the decree against the evidence, is not bound to award a feigned issue to try the questions of fact, but may direct such judgment and decree to be entered as the surrogate should have made.

Pilling *v.* Pilling.

APPEAL from a decree of the surrogate of the county of Clinton, refusing to admit to probate an instrument purporting to be the last will and testament of James Pilling, late of the town of Ausable in that county, deceased; which decree was made on the 31st day of December, 1863. The appeal was brought by Frank Pilling, a grandson of the testator, and only child of Harvey Pilling, deceased.

*Ames & Hewitt*, for the appellant,

*Beckwiths & Johnson*, for the respondents George Pilling and others.

*Robert S. Hale*, for the respondent George Adgate and others.

*Winslow C. Watson, Jun.* special guardian for infant respondents.

*By the Court*, BOCKES, J. This is an appeal from the decree of the surrogate of Clinton county, denying probate of the will of James Pilling, deceased.

All the requisite formalities in the execution of the will were observed, and it was refused probate on the ground, solely, that the testator at the time of its publication was not of sound and disposing mind and memory and was therefore incompetent to make a last will and testament.

The instrument offered for probate was executed on the 11th January, 1862, in the presence of four persons, three of whom signed as witnesses; and by its terms made disposition of property, real and personal, amounting to about forty thousand dollars. The deceased died July 1, 1863, aged about seventy-five or seventy-six years. It seems that he had an attack of paralysis, or "partial paralysis," a few weeks prior to the execution of the will, and his health was somewhat disturbed for a long time by a general constipa-

tion of the bowels. But his illness was not very severe or dangerous in character, and did not long prevent him from attending church, making his usual visits among his neighbors and friends, and giving his personal attention to his business affairs. These he continued to direct until his decease, and from aught that appears, with his usual sagacity.

The persons who witnessed the will had known the deceased for many years, and were well acquainted with him. They regarded him as of sound mind and memory, at that time. Mr. J. D. Kingsland, one of the witnesses, states that he had been well acquainted with Mr. Pilling for thirty or forty years, and they were as intimate as two men well could be, and that he had had business transactions with him, more or less, for over twenty years. Mr. Cleaves, another of the witnesses to the instrument, says that he had known him for ten years and saw him quite frequently during the last three years of his life. These, with the third witness, Mr. Scribner, and also Mr. Ames who drew the will, and Mr. Hewitt who was present and heard him direct its terms and provisions, all deemed him of sound and disposing mind and memory, and on their examination before the surrogate declared their opinion to that effect.

It appears, also, that the deceased had long contemplated the making of a will, and had selected Mr. Ames as the one he wished to draft it. This purpose he had repeatedly expressed, and he had, too, avowed his intention, in a general way corresponding with the terms and conditions as they now appear in the instrument. After it was executed he made allusion to the fact, showing a recollection of what he had done.

His directions to Mr. Ames, as stated by the latter, were given specifically, clearly and understandingly. He had previously made an appointment with Mr. Ames for the purpose, stated his general design to fix his property so that his sons could not use it up, and with deliberation and careful thought dictated the terms and conditions of the instrument. It was

Pilling *v.* Pilling.

prepared in his presence, according to his purpose, and signed after discussing with Mr. Ames its several parts. This seems firmly established by the evidence of Mr. Ames, Mr. Hewitt, Mr. J. D. Kingsland and Mr. Scribner.

On this point it may be well to see how the statements of these witnesses stand on the record. Mr. Kingsland says the instrument was carefully read over to the deceased, and he was especialy interrogated by Mr. Ames, in reference to all the legacies, bequests and particulars contained therein; that he was particular to inquire in relation to the effect of every part of the instrument he did not fully understand, and after the same and the entire contents seemed by him to be fully understood, he signed it. The witness adds: "The reason why I became certain that he knew the instrument as his will was because every part of it was fully considered by him in my presence, and after such consideration he signed it." Again: "He seemed fully to understand what he wanted the instrument to contain, and when any of its provisions were read over that he did not fully comprehend at first reading, such provisions were read over to him, and he expressed himself satisfied with the instrument, when he signed it." Mr. Cleaves says: "The will was read over to him in my presence particularly. He seemed to understand it — the different parts of it. He made some expressions as to different parts of it. I think he requested one clause to be read the second time." Mr. Ames states particularly the circumstances under which the paper was prepared, the general purpose of the deceased as expressed by him, his particular dictation of all its parts, his discussion of its provisions and its deliberate consideration and execution. In all this he is corroborated by Mr. Hewitt. So, Mr. Scribner, while he thought him a little forgetful, says he made comments when the will was being read over, in regard to its contents, and finally expressed himself to the effect that the will contained the best that he could do.

These witnesses speak of the circumstances attending the

preparation and execution of the will, and they tend thereby to prove, if they do not incontestibly demonstrate, the mental capacity and vigor of the deceased at the time he published the instrument as his last will and testament. These statements of fact are not contradicted, nor is there any thing disclosed by the case tending to impair their force. These witnesses are very intelligent, clear in their statements, and of undoubted integrity. Accepting their evidence as true, it seems impossible that Mr. Pilling, at the time the instrment was executed, was incapable of making a legal disposition of his property by a last will and testament. In addition we have the fact before us that he transacted other matters of business about the same time, and continued the management of his property, which must have required business capacity, down to the time of his decease.

Other witnesses give general evidence tending to show a retention of capacity and mental vigor. Mr. Edmund Kingsland, Mr. Whitney, Mr. Tomlinson, Mr. Payne, Mr. Thomas M. Hustis, Mr. Page, and some others, frequently saw him, conversed with him, and many of them had business transactions with him during the latter period of his life. They all speak of him as possessing his usual faculties and powers of mind, except perhaps, as some expressed it, he seemed at times a little forgetful. The purport and strength of their evidence is to the effect that he was capable of making a valid will. According to their evidence his mental faculties could not have been seriously disordered or impaired, certainly not to an extent to render him incapable of reasoning upon matters requiring the exercise of prudence, discretion and judgment; or incompetent to judge correctly of surrounding circumstances. Is the case made by the proponent met and overcome by the contestants? Doctor Weston testifies that he had been well acquainted with the deceased for upwards of twenty years, and was his family physician. He attended him before and at the time the will was executed. He says he was not possessed of his usual vigor of

Pilling *v.* Pilling.

mind. He says : "His mind, so far as it acted, was sound and rational, but the sudden stopping indicated a want of memory or defective memory." He also says he was naturally slow in uttering his opinions, not rapid in expressing his understanding. His sentences were well connected and rational, except want of memory. *He did not by any speech otherwise than this indicate mental derangement.* Doctor Houghton saw him in December, when he had the attack spoken of as "partial paralysis." He also saw him subsequently. His conclusion was that his mind had been seriously enfeebled. Mr. Raymond, a son in law of the deceased, was with him during the month of January, and saw him about every day. Had difficulty in making him understand. He detailed one remarkable conversation, inconsistent with a sound and healthy state of mind. He did not consider him competent to make a will. The wife of this witness was one of the contestants of the will. Mrs. Pilling, the widow of the deceased, thought he was different after he had the attack of paralysis ; his memory was bad ; had to talk to him a good deal to have him understand a little. George Pilling, son and contestant, testified, that he talked incoherently and unreasonably. In speaking of the cost of a farm, he put acres in the place of dollars and dollars in the place of acres—did not think of any thing else—hard to make him understand. Henry Pilling, a son and contestant, said his memory was bad—could not understand readily—tried to do business and was found unable to consummate it. He deemed him incompetent to make a will. Mr. Pope saw him and tried to do business with him—thought him unsound in mind—was forgetful.

This is the substance of the evidence on the part of the contestants. In my judgment it fails to overcome the case made by the proponent in favor of the mental capacity of the deceased. There is a strong preponderance of evidence in favor of the position that he, at the time the will was executed, possessed capacity and understanding sufficient to

make a valid disposition of his property by a last will and testament. It is quite possible that his mind and memory were somewhat impaired. Such is the natural effect of age and disease. But if we may rely on the evidence of those who were present when the will was prepared and executed, he had that degree of recollection which enabled him to consider the property he had to dispose of, and the persons to whom he wished to give it, and the power of summing up in his mind so as to practice caution and prudence in the exercise of his bounty. There is no pretense that he made the will under any delusion; or that he was improperly influenced. On the contrary, he dictated the terms, which were substantialy in consonance with his settled purpose, frequently expressed while in a healthy condition both of body and mind. The instrument was drawn according to his suggestion and under his free dictation. The position taken by the contestants was that his faculties—his judgment and understanding—were destroyed; that he was an imbecile to an .extent which rendered him incapable of performing business transactions. This position can not be sustained, unless we discredit the evidence of the four or five witnesses who were present when the instrument was prepared and executed, and also the evidence of some half dozen others who conversed and did business with him on numerous occasions about the time and after that date.

In my judgment the decision of the surrogate was clearly against the evidence, and the decree refusing probate of the will should be reversed.

The next question is whether a feigned issue should be awarded to try the question of fact in regard to the mental capacity of the testator, at the time of making the will; or whether this court should now direct such judgment and decree as the surrogate should have made when the case was before him.

Prior to the judiciary act of 1847, appeals from orders of the surrogate admitting or denying probate of wills were

taken to the circuit judge, and in case of reversal by him of the surrogate's decree upon questions of fact, a feigned issue was directed to be made up to try the question by jury at the circuit. (2 *R. S.* 66, §§ 55, 57. *Id.* 608, §§ 90–98.) In case of reversal by the circuit judge upon a question of fact, this course was the only one authorized by law. He could in that case make no other or different order. By the judiciary act of 1847, such appeals were authorized to be brought to the Supreme Court. (*Sess. Laws*, 1847, *chap.* 280, § 17. 4 *How. Pr. Rep.* 439.) But no limitation was then made upon the powers of the Supreme Court as an appellate tribunal; nor was any direction given in regard to the mode of proceeding. In 1848, an act was passed in relation to proceedings *pending* before the late circuit judges, and empowered the Supreme Court to hear and determine all appeals taken from any decision made by any surrogate in relation to the probate of any will, to the late circuit judges; and it was there declared that the Supreme Court should possess the same powers and exercise the same jurisdiction, on such appeals, as were conferred by law upon any of the late circuit judges; and further, to make such orders in these cases as should be just. This act had application only to appeals pending at the time of its passage. I am unable to find any statute limiting the powers of the Supreme Court in regard to the disposition of appeals like this under consideration; and this court has, by express provision, all the powers and jurisdiction possessed by the former Court of Chancery. (*Const. art.* 6. *Judiciary Act*, 1847, § 16.) It is indisputable that the Court of Chancery had authority on appeal to declare a paper valid or invalid as a will, and to adjudge that it be admitted to or refused probate. That court possessed this power by virtue of its general jurisdiction. (26 *Wend.* 318, *et seq.* 8 *Paige*, 502. 10 *id.* 85. 11 *Barb.* 661. 22 *N. Y. Rep.* 420.) The question whether this court possessed greater powers than did the circuit judges on appeals of this character was considered in *Whitbeck* v. *Patter-*

*son*, (22 *Barb.* 84, 85.) Judge Strong there remarks : " This court not only takes the place of the circuit judge, but also that of the Court of Chancery, in respect to such appeals. ·It has all the powers of the circuit judge, in such cases, and also the powers of the Court of Chancery on appeal· from that officer." This question was also considered in *Mason* v. *Jones*, (2 *Bradf.* 181,) and a similar conclusion was arrived at. In that case the principle was adopted that appellate courts, unless limited by statutory provisions, have the power to give the judgment which the inferior tribunal should have rendered. I am therefore led to the conclusion that it is within the jurisdiction and powers of the Supreme Court in this class of appeals to award such judgment as the surrogate should have given when the case was before him for adjudication. The court may undoubtedly award a feigned issue to try the question of fact. This has been done by the Supreme Court, the Court of Errors and by the Court of Appeals. So the case may be remitted to the ·surrogate's court with judgment of reversal and with directions to proceed there with it, as was done in *Burritt* v. *Silliman*, (13 *N. Y. Rep.* 93, 98.)

In the case under consideration, we are of the opinion, most clearly, that the deceased was competent to make the will presented for ·probate. We think the evidence before us quite conclusive of this question. Nor do we deem it at all probable, after a very careful examination and consideration of the whole case, that the contestants, on a retrial before the surrogate or before a jury, could establish the allegation that the instrument offered for probate was invalid· as a will, by reason of the testator's imbecility and incompetency.

We must therefore order a reversal of the decree appealed from, and direct, as was done in *Coffin* v. *Coffin*, (23 *N. Y. Rep.* 9,) that the will stand as a valid instrument, and that the surrogate of Clinton county admit the same to probate and enter it of record, and issue letters testamentary thereon.

All the costs in the case, from the first, should be paid from

the estate, except that the respondents, and contestants, George Pilling, Henry Pilling and Richard Pilling, should have no costs of the appeal.

Judgment accordingly.

[St. LAWRENCE GENERAL TERM, October 4, 1865. *Bockes, James* and *Rosekrans,* Justices.]